No. 24–60055

---

# UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

---

George D. Arnesen; Jeffrey Ryan Bradley,
*Plaintiffs-Appellants*,

v.

Gina Raimondo, Secretary, U.S. Department of Commerce;
National Marine Fisheries Service; Janet Coit, NMFS Assistant Administrator;
Samuel D. Rauch, III, NMFS Deputy Assistant Administrator for Regulatory
Programs; Gulf of Mexico Fishery Management Council, *Et al.*,
*Defendants-Appellees*.

---

Karen Bell; A.P. Bell Fish Company, Inc.; William Copeland,
*Plaintiffs-Appellants*,

v.

Gina Raimondo, Secretary, U.S. Department of Commerce; National Marine
Fisheries Service; Janet Coit, NMFS Assistant Administrator,
*Defendants-Appellees*.

---

Appeal from the United States District Court
for the Southern District of Mississippi
Nos. 1:23-cv-145 and 1:23-cv-160 (Hon. Taylor B. McNeel)

---

# FEDERAL DEFENDANTS' CONSOLIDATED ANSWERING BRIEF

---

TODD KIM
*Assistant Attorney General*

RACHEL HERON
ARIELLE MOURRAIN JEFFRIES
JOHN E. BIES
*Attorneys*
Environment and Natural Resources Div.
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-3785
john.bies@usdoj.gov

## CERTIFICATE OF INTERESTED PERSONS

George D. Arnesen, *Et al.*,
*Plaintiffs-Appellants*,

v.

Gina Raimondo, Secretary, U.S. Department of Commerce, *Et al.*,
*Defendants-Appellees.*

———————————————

Karen Bell, *Et al.*,
*Plaintiffs-Appellants*,

v.

Gina Raimondo, Secretary, U.S. Department of Commerce, *Et al.*,
*Defendants-Appellees.*

Under Circuit Rule 28.2.1, Federal Defendants/Appellees are

governmental parties that need not furnish a certificate of interested

persons.

s/ *John E. Bies*
JOHN E. BIES

Counsel for Federal Defendants

## STATEMENT REGARDING ORAL ARGUMENT

Federal Defendants believe that oral argument would be useful to the Court given the significant and complex questions these appeals raise regarding the Magnuson-Stevens Fishery Conservation and Management Act and the Appointments Clause of the U.S. Constitution.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................... i

STATEMENT REGARDING ORAL ARGUMENT .................................... ii

TABLE OF AUTHORITIES ........................................................... vi

GLOSSARY ........................................................................... xvii

INTRODUCTION ......................................................................... 1

STATEMENT OF JURISDICTION ................................................... 4

STATEMENT OF THE ISSUES ....................................................... 5

PERTINENT CONSTITUTIONAL PROVISIONS,
    STATUTES, AND REGULATIONS ................................................. 8

STATEMENT OF THE CASE ......................................................... 8

    A.    Statutory and regulatory background.................................... 8

        1.    The Magnuson-Stevens Fishery
            Conservation and Management Act............................ 8

            a.    The role of the Secretary and the
                Regional Fishery Management
                Councils............................................................ 10

            b.    The establishment of Fishery
                Management Plans............................................. 11

            c.    The creation of legally binding fishery
                regulations ........................................................ 14

        2.    Delegation of the Secretary's Magnuson-
            Stevens Act authorities to the Assistant
            Administrator for Fisheries......................................... 17

B.    Factual background .............................................. 18

    1.    The Gulf of Mexico greater amberjack stock .............. 18

    2.    Amendment 54 ............................................ 19

    3.    Final Rule .............................................. 21

C.    Proceedings below ............................................. 23

SUMMARY OF ARGUMENT ................................................. 25

STANDARD OF REVIEW .................................................. 32

ARGUMENT ........................................................... 33

I.    The federal courts lack jurisdiction to consider certain of Plaintiffs' claims. .......................................... 33

II.   The Final Rule imposing the greater amberjack catch limit is lawful. ............................................... 36

A.    The Magnuson-Stevens Act gives the Secretary final word on the content of fishery management plans and final implementing rules. .................... 37

    1.    The terms of the Magnuson-Stevens Act do not limit the Secretary's review. ................. 38

    2.    Even if the Secretary's review were limited to consistency with the National Standards and applicable law, the Secretary would still retain ultimate policy discretion over fishery management plans. ......................... 48

B.    The Magnuson-Stevens Act assigns Regional Fishery Management Councils only an advisory role. ....................................................... 53

C.    Members of the Gulf Council are not officers of the United States and did not act as officers when proposing the challenged regulations to the Secretary.................................................................. 58

D.    The Court must construe any ambiguity in the Magnuson-Stevens Act to avoid constitutional doubt. ................................................................... 73

III.   Plaintiffs are not entitled to relief against the amberjack catch limits established by the Final Rule. ................. 75

A.    If the Regional Council's recommendations improperly constrict the Secretary's discretion, statutory restrictions on Secretarial discretion should be severed to the extent necessary under the Constitution. ................................................... 76

B.    Any injury to Plaintiffs is caused by the Secretary's independent decision to promulgate the Final Rule, not any constitutional infirmity in the Regional Council. ............................................. 83

C.    Plaintiffs cannot show injury caused by any constitutional infirmity in the Regional Council because a duly appointed quorum of the Gulf Council recommended the amberjack catch limits............... 88

D.    The *Arnesen* Plaintiffs' removal claims are not relevant here. ......................................................... 94

CONCLUSION ......................................................... 97

CERTIFICATE OF COMPLIANCE ........................................ 98

CERTIFICATE OF DIGITAL SUBMISSION ......................................... 99

# TABLE OF AUTHORITIES

## Cases

*Alabama-Coushatta Tribe of Texas v. United States*,
757 F.3d 484 (5th Cir. 2014) .................................................. 34

*Alaska Factory Trawler Ass'n v. Baldridge*,
831 F.2d 1456 (9th Cir. 1987) ................................................ 44

*All. Against IFQs v. Brown*,
84 F.3d 343 (9th Cir. 1996) .................................................... 51

*Armstrong v. Exceptional Child Center, Inc.*,
575 U.S. 320 (2015) .............................................................. 35

*Ayotte v. Planned Parenthood of N. New England*,
546 U.S. 320 (2006) ................................................. 29, 77, 82

*Barr v. American Assoc. of Pol. Consultants, Inc.*,
140 S. Ct. 2335 (2020) ................................................... 81, 82

*Buckley v. Valeo*,
424 U.S. 1 (1976) .......................................................... 71, 72

*Burell v. Prudential Ins. Co. of Am.*,
820 F.3d 132 (5th Cir. 2016) ................................................. 32

*Burgess v. Fed. Deposit Ins. Corp.*,
871 F.3d 297 (5th Cir. 2017) ................................................. 68

*Burke v. Coggins*,
521 F. Supp. 3d 31 (D.D.C. 2021) ......................................... 46

*Clark v. Rameker*,
573 U.S. 122 (2014) .............................................................. 55

*Collins v. Yellen,*
141 S. Ct. 1761 (2021) ......................................................... 95

*Comm. Fin. Servs. Ass'n v. Cons. Fin. Prot. Bd.,*
51 F.4th 616 (5th Cir. 2022) ................................. 7, 31, 95, 96

*Conservation Law Foundation v. Ross,*
374 F.Supp.3d 77 (D.D.C. 2019) ........................................ 52

*Delta Com. Fisheries Ass'n v. Gulf of Mex. Fishery Mgmt. Council,*
364 F.3d 269 (5th Cir. 2004) ................................................. 9

*Edmond v. United States,*
520 U.S. 651 (1997) ..................................................... 72, 86

*Estes v. U.S. Dep't of the Treasury,*
219 F. Supp. 3d 17 (D.D.C. 2016) ...................................... 64

*Fed. Election Commission v. NRA Pol. Victory Fund,*
6 F.3d 821 (D.C. Cir. 1993) ................................................ 92

*Fishing Co. of Alaska v. Gutierrez,*
510 F.3d 328 (D.C. Cir. 2007) ............................................ 44

*Flaherty v. Ross,*
373 F. Supp. 3d 9 (D.D.C. 2019) ................................... 47, 59

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
561 U.S. 477 (2010) ............................................... 57, 80, 82

*Freytag v. Comm'r,*
501 U.S. 868 (1991) ........................................... 36, 68, 71, 86

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives,*
920 F.3d 1 (D.C. Cir. 2019) ................................................ 87

*Hoyt R. Matise Co. v. Zurn,*
754 F.2d 560 (5th Cir. 1985) .............................................. 32

*J.H. Miles & Co. v. Brown,*
 910 F. Supp. 1138 (E.D. Va. 1995) ....................................... 60

*Jennings v. Rodriguez,*
 138 S. Ct. 830 (2018) ................................................................ 74

*Johanns v. Livestock Mktg. Ass'n,*
 544 U.S. 550 (2005) ................................................................. 86

*K&R Contractors, LLC v. Keene,*
 86 F.4th 135 (4th Cir. 2023) ................................................. 95

*Kajmowicz v. Whitaker,*
 42 F.4th 138 (3d Cir. 2022) ................................................... 87

*Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wis.
 v. United States,*
 259 F. Supp. 2d 783 (W.D. Wis. 2003) ................................ 70

*Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wis.
 v. United States,*
 367 F.3d 650 (7th Cir. 2004) ................................................ 70

*Lofstad v. Raimondo,*
 2024 WL 836392 (D.N.J. Feb. 28, 2024) ........................... 56, 59, 65, 68

*Lovgren v. Locke,*
 701 F.3d 5 (1st Cir. 2012) ..................................................... 51

*Lucia v. Sec. & Exch. Comm'n,*
 585 U.S. 247 (2018) ..................................... 58, 63, 68, 70, 71

*Massachusetts v. Pritzker,*
 10 F. Supp. 3d 208 (D. Mass. 2014) ..................................... 17

*McIntosh v. United States,*
 144 S.Ct. 980 (2024) ......................................................... 43, 46

*Medina Cnty. Env't. Action Ass'n v. Surface Transp. Bd.*,
  602 F.3d 687 (5th Cir. 2010) .................................................. 64

*Meliezer v. Resolution Tr. Co.*,
  952 F.2d 879 (5th Cir. 1992) ........................................... 46, 47

*Moose Jooce v. FDA*,
  981 F.3d 26 (D.C. Cir. 2020) ............................................... 86

*Myers v. United States*,
  272 U.S. 52 (1926) ......................................................... 89, 90

*N.C. Fisheries Ass'n v. Gutierrez*,
  550 F.3d 16 (D.C. Cir. 2008) ........................................... 14, 65

*National Association of Home Builders v. Defenders of Wildlife*,
  551 U.S. 644 (2007) ........................................................... 52

*Nguyen v. United States*,
  539 U.S. 69 (2003) ............................................................ 92

*State of New York v. Raimondo*,
  84 F.4th 102 (2d Cir. 2023) ................................................ 51

*United Cook Inlet Drift Association v. National Marine Fisheries Serv.*,
  No. 3:21-CV-00247-JMK,
  2022 WL 2222879 (D. Alaska June 21, 2022) ...................... 60

*United States v. Am. Ry. Express Co.*,
  265 U.S. 425 (1924) ........................................................... 32

*United States v. Arthrex, Inc.*,
  594 U.S. 1 (2021) ........................... 28, 29, 57, 64, 77, 78, 79, 80, 81, 89

*United States v. Concord Mgmt. & Consulting LLC*,
  317 F. Supp. 3d 598 (D.D.C. 2018) ..................................... 94

*United States v. Hansen,*
   599 U.S. 762 (2023) .................................................. 48, 73, 74

*Vernon Smith v. School Bd. of Concordia Par.,*
   88 F.4th 588 (5th Cir. 2023) ................................................ 24

*Webster v. Doe,*
   486 U.S. 592 (1988) ........................................................... 35

*West Virginia v. Env. Prot. Agency,*
   597 U.S. 697 (2022) ........................................................... 45

*Williams v. Thrasher,*
   62 F.2d 944 (5th Cir. 1933) ................................................. 86

## Statutes

5 U.S.C. § 3395 ..................................................................... 96

5 U.S.C. § 3592 ..................................................................... 96

5 U.S.C. § 706(2)(B) ............................................................ 35

5 U.S.C. § 7513 ..................................................................... 79

Magnuson-Stevens Act, 16 U.S.C. § 1801 *et seq.*...................... 4

   16 U.S.C. § 1801 .................................................................. 8

   16 U.S.C. § 1801(a)(1)–(3) ................................................... 9

   16 U.S.C. § 1801(a)(6) ......................................................... 9

   16 U.S.C. § 1801(b)(1) ......................................................... 9

   16 U.S.C. § 1801(b)(3) ......................................................... 9

   16 U.S.C. § 1801(b)(4) ......................................................... 9

16 U.S.C. § 1801(b)(5) ................................... 10, 11, 27, 55, 77

16 U.S.C. § 1802(13) ............................................................. 8

16 U.S.C. § 1802(26) ........................................................... 70

16 U.S.C. § 1802(27) ........................................................... 70

16 U.S.C. § 1851(a) .............................................................. 12

16 U.S.C. § 1851(a)(1) .................................................... 49, 50

16 U.S.C.  § 1851(a)(3) ........................................................ 49

16 U.S.C. § 1851(a)(4) .................................................... 49, 50

16 U.S.C. § 1851(a)(5) ......................................................... 49

16 U.S.C. § 1851(a)(7) ......................................................... 49

16 U.S.C. § 1851(a)(8) ......................................................... 49

16 U.S.C. § 1851(b) ........................................................ 12, 50

16 U.S.C. § 1852 ............................................................ 10, 16

16 U.S.C. § 1852(a) ............................................................. 34

16 U.S.C. § 1852(a)(1) ......................................................... 10

16 U.S.C. § 1852(a)(1)(E) ............................................. 56, 88, 91

16 U.S.C. § 1852(b)(2)(A) ............................................... 88, 91

16 U.S.C. § 1852(b)(2)(C) ..................................................... 89

16 U.S.C. § 1852(a)(2) ......................................................... 10

16 U.S.C. § 1852(e)(1) ............................................................ 70, 89

16 U.S.C. § 1852(f)(1)–(3) ............................................................ 67

16 U.S.C. § 1852(h)(1) ............................................ 12, 13, 26, 54

16 U.S.C. § 1852(i)(1) ............................................................ 27, 55

16 U.S.C. § 1853 ............................................................................ 12

16 U.S.C. § 1853(a)(l)–(15) ........................................................ 11

16 U.S.C. § 1853(a)(1)(C) ............................................................ 12

16 U.S.C. § 1853(a)(l) .................................................................. 11

16 U.S.C. § 1853(a)(2)–(4) .......................................................... 11

16 U.S.C. § 1853(b)(l)–(14) ........................................................ 11

16 U.S.C. § 1853(c)(l) .................................................................. 15

16 U.S.C. § 1854 .................................................................... 16, 46

16 U.S.C. § 1854(a) ...................................................................... 12

16 U.S.C. § 1854(a)(1) ............................................ 40, 41, 48, 62

16 U.S.C. § 1854(a)(1)(A) ...................................... 13, 77, 78

16 U.S.C. § 1854(a)(1)(B) ...................................... 13, 27, 56

16 U.S.C. § 1854(a)(2)(A) ............................................................ 13

16 U.S.C. § 1854(a)(3) ................................ 13, 26, 39, 40, 41, 42, 65, 83

16 U.S.C. § 1854(a)(4) ............................................................ 13, 40

16 U.S.C. § 1854(b) ........................................................ 12, 14, 43

16 U.S.C. § 1854(b)(1) ................................................. 42, 77, 78

16 U.S.C. § 1854(b)(1)(A) .......................................... 27, 56, 62

16 U.S.C. § 1854(b)(1)(B) ................................................ 15, 44

16 U.S.C. § 1854(b)(3) ............................ 15, 26, 39, 44, 45, 47

16 U.S.C. § 1854(c) ................................ 13, 14, 26, 40, 47, 70

16 U.S.C. § 1854(c)(1)(A) ...................................................... 87

16 U.S.C. § 1854(c)(2)(A) ...................................................... 14

16 U.S.C. § 1854(c)(3) .................................................... 70, 83

16 U.S.C. § 1854(c)(4) ........................................................... 14

16 U.S.C. § 1854(c)(5) ........................................................... 14

16 U.S.C. § 1854(c)(6) .................................................... 16, 87

16 U.S.C. § 1854(c)(7) ........................................................... 16

16 U.S.C. § 1854(e) ................................................................ 85

16 U.S.C. § 1854(e)(2) .................................................... 61, 85

16 U.S.C. § 1854(e)(3) ........................................................... 85

16 U.S.C. § 1854(e)(4) ........................................................... 85

16 U.S.C. § 1854(e)(5) ................................................ 30, 85, 87

16 U.S.C. § 1854(h) ...................................................... 69, 70, 83

16 U.S.C. § 1855 .................................................................. 16

16 U.S.C. § 1855(c)(1) ....................................................... 16

16 U.S.C. § 1855(c)(2) ............................................ 66, 67, 83

16 U.S.C. § 1855(d) ............................... 10, 16, 26, 38, 39, 47

16 U.S.C. § 1855(f) ................................................ 33, 34, 35

16 U.S.C. § 1855(f)(1)–(2) ............................... 5, 25, 33, 56

16 U.S.C. § 1855(f)(1)(B) ....................................... 35, 43

28 U.S.C. § 1291 ................................................................. 4

28 U.S.C. § 1331 ................................................................. 4

28 U.S.C. § 292(a) ............................................................ 92

28 U.S.C. § 46(b) .............................................................. 92

33 U.S.C. § 1342 ............................................................... 52

35 U.S.C. § 6(c) ................................................................. 79

42 U.S.C. § 1301 ............................................................... 39

42 U.S.C. § 1311(a) .......................................................... 39

42 U.S.C. § 1312 ............................................................... 39

Act of Feb. 25, 1863, ch. 58, § 1,
 12 Stat. 665 ................................................................... 90

Fishery Conservation and Management Act,
 Pub. L. No. 94-265, 90 Stat. 331 (1976) .......................... 8

Magnuson–Stevens Fishery Conservation and Management
Reauthorization Act of 2006, Pub. L. No. 109-479 ............................... 8

Pub. L. No. 109–479, Tit. I, § 104, 120 Stat. 3579 (2007) ..................... 85

Reorganization Plan No. 4 of 1970, 84 Stat. 2090 (1970) ...................... 17

Sustainable Fisheries Act of 1996, Pub. L. No. 104-297 .......................... 8

## Rules

Fed. R. App. P. 4(a)(1)(B) ............................................................. 4

## Regulations

50 C.F.R. § 600.215 .............................................................. 90, 91

50 C.F.R. § 600.305–600.355 ........................................................ 50

50 C.F.R. § 600.310(b)(2)(ii) ....................................................... 50

49 Fed. Reg. 39548 (1984) ........................................................... 20

85 Fed. Reg. 7246 (Feb. 7, 2020) .................................................... 48

88 Fed. Reg. 13077 (March 2, 2023) .......................................... 20, 61, 62

88 Fed. Reg. 14964 (March 10, 2023) ............................................ 21, 62

*Amendment 54 to the Reef Fish Fishery of the Gulf of Mexico*, 88 Fed.
Reg. 39193, 39194 (June 15, 2023) .............................................. *passim*

*Rebuilding Plan for Greater Amberjack in the Gulf of Mexico*,
68 Fed. Reg. 39898 (July 3, 2003) ................................................. 18

## Constitutional Provisions

U.S. Const. Art. 2, § 2, cl. 2 ................................................................ 58, 88

## Other Authorities

Signing Statement of President Bill Clinton,
   1996 Sustainable Fisheries Act,
   1996 U.S.C.C.A.N. 4120, 1996 WL 787969 (Oct. 11, 1996) ................. 61

Signing Statement of President George W. Bush,
   2006 Magnuson-Stevens Reauthorization Act,
   2007 U.S.C.C.A.N. S83, 2007 WL 892712 (Jan. 12, 2007) ............ 60, 61

*Magnuson Act Process, Table X* at pdf p. 31, National Oceanic and
   Atmospheric Administration (Oct. 25, 2017), https://perma.cc/H7SV-
   3QS9. ..................................................................................................... 40

NOAA Fisheries, *Species Directory: Greater Amberjack*,
   https://perma.cc/SM3P-US27 ................................................................ 18

*Oceana, Inc. v. Ross*,
   No. 17-cv-05146, ECF No. 124 (C.D. Cal. Nov. 18, 2019) .............. 45, 46

*Officers of the United States*
   *Within the Meaning of the Appointments Clause*,
   31 Op. O.L.C. 73 (2007) ........................................................... 63, 93, 94

*Power of the Secretary of the Treasury to Remove Inspectors of Hulls
   and Boilers*, 10 Op. Att'y Gen. 204 (1862) ......................................... 90

Signing Statement of President Donald J. Trump,
   2018 Amendments to Magnuson-Stevens Act,
   2018 WL 6839393 (Dec. 31, 2018) ....................................................... 60

The Federalist No. 45 (J. Cooke ed. 1961) .............................................. 93

The Federalist No. 72 (J. Cooke ed. 1961) .............................................. 57

## GLOSSARY

| | |
|---|---|
| amberjack | Gulf greater amberjack |
| Amendment 54 | Amendment 54 to the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico |
| Assistant Administrator | The Assistant Administrator for Fisheries of the National Oceanic & Atmospheric Administration and head of the National Marine Fisheries Service |
| Final Rule | *Amendment 54 to the Reef Fish Fishery of the Gulf of Mexico*, 88 Fed. Reg. 39193 (June 15, 2003), https://perma.cc/3P2N-WFTP |
| Gulf | Gulf of Mexico |
| Gulf Council | Gulf of Mexico Fishery Management Council, *established by* 16 U.S.C. § 1852(a)(1)(E) |
| Magnuson-Stevens Act | Magnuson-Stevens Fishery Conservation and Management Act, *codified at* 16 U.S.C. § 1801 *et seq.* |
| NMFS | National Marine Fisheries Service |
| National Standards | Section 301 of the Magnuson-Stevens Act, National standards for fishery conservation and management, *codified at* 16 U.S.C. § 1851 |
| Regional Councils | Regional Fishery Management Councils |
| The Secretary | The Secretary of Commerce |

## INTRODUCTION

Congress enacted the Magnuson-Stevens Fishery Conservation and Management Act (the Magnuson-Stevens Act) in 1976 to address overfishing of critical fish stocks and to establish sound conservation and management practices for fish within the United States' exclusive economic zone (or "federal waters"). In doing so, Congress recognized the valuable contribution of fisheries to state and local economies, the need for any national policy to account for the differences among regional fisheries, and the coordination necessitated by the fact that the resources being managed—the fish and other aquatic species—move freely between federal and state waters. Accordingly, Congress established a structured process by which the Secretary of Commerce ordinarily receives and considers recommendations from regional advisory bodies representing state and local stakeholders—the Regional Fishery Management Councils—before she establishes or amends a fishery management plan for a particular fishery or promulgates binding implementing regulations.

That is the process Federal Defendants followed for the challenged Gulf greater amberjack catch limits. Exercising authority delegated

from the Secretary, the National Oceanic and Atmospheric Administration's Assistant Administrator for Fisheries (Assistant Administrator), who oversees the National Marine Fisheries Service (NMFS), solicited and received from the Gulf of Mexico Regional Fishery Management Council (the Gulf Council) proposed catch limits to facilitate the rebuilding of overfished amberjack stock and proposed implementing regulations. Following review, the Assistant Administrator proposed, and published for public comment, the catch limits and regulations recommended by the Council. After considering the comments received, the Assistant Administrator approved the proposed amendment to the fishery management plan to include the revised catch limits and promulgated a final rule implementing them.

Plaintiffs are commercial fishers who object to the amberjack catch limit. They challenge the catch limits not based on any substantive objection to the limits determined to be necessary to permit rebuilding of the amberjack stock, but because the members of the Gulf Council that recommended the catch limits were not, in Plaintiffs' view, appointed in accordance with the Appointments Clause. But the Magnuson-Stevens Act's procedural requirement that the Secretary

obtain input from regional stakeholders with expertise does not constrain the Secretary's substantive policy judgment to faithfully execute Congress's mandate in the Act.

Setting aside the fact that Plaintiffs have identified a valid waiver of sovereign immunity for only a subset of their claims, Plaintiffs' challenge fails because the Gulf Council's role is purely advisory. Council members lack the type of authority necessary to qualify as officers of the United States. Only final, promulgated regulations legally bind fishery participants, and only the Secretary can approve and establish fishery management plans and determine the contents of— and promulgate—final implementing regulations. Besides, even if Council members were exercising significant authority, Plaintiffs are not entitled to vacatur of the Final Rule. This Court should affirm summary judgment for Federal Defendants.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under the Magnuson-Stevens Act, 16 U.S.C. § 1801 *et seq.*, and 28 U.S.C. § 1331. As explained below, the district court lacked jurisdiction over certain of Plaintiffs' claims. *See* Part I, *infra*. The district court entered final judgment on January 31, 2024. (ROA.10674.) Both the *Bell* Plaintiffs and the *Arnesen* Plaintiffs timely appealed on February 1, 2024. (ROA.10675-76; ROA.10678); *cf.* Fed. R. App. P. 4(a)(1)(B). This Court has appellate jurisdiction. 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     As a threshold matter, whether Congress's limited waiver of sovereign immunity in the Magnuson-Stevens Act authorizing judicial review of "[r]egulations promulgated by the Secretary" and "actions that are taken by the Secretary under regulations which implement a fishery management plan," 16 U.S.C. § 1855(f)(1)–(2), authorizes *Arnesen* Plaintiffs' claims for relief against a fishery management plan and relief directly against the Gulf Council and its members.

2.     Whether the Magnuson-Stevens Act unambiguously confers significant federal authority to Regional Fishery Management Council members where

a.     the Secretary has authority to approve or disapprove Council-recommended fishery management plans and to establish her own plans where necessary even absent a Council proposal, and, more fundamentally, only the Secretary can determine the terms of—and promulgate—final implementing regulations which legally bind fishery participants;

b.    the Secretary can exercise her policy judgment in determining whether any Council proposals are consistent with Congress's direction in the Act's National Standards;

c.    no provision of the Act authorizes the Regional Councils to take any action that has a direct legal effect on any fishery participant; and

d.    constitutional avoidance requires construing any ambiguity in the Act against finding the Council members to have significant authority.

3.    Whether Plaintiffs are entitled to vacatur of the Final Rule if the Court concludes that members of the Gulf Council unconstitutionally exercise significant authority without a proper appointment under the Appointments Clause, when

a.    the Constitution would displace any provision of the Magnuson-Stevens Act that authorizes Council members to unconstitutionally exercise significant federal authority;

b.    any injury to Plaintiffs was not caused by any constitutional infirmity in the Council when an independent decision to promulgate

the Final Rule by a duly authorized officer effectively ratified the

Council's recommendation;

     c.    even if the votes of members not appointed by the Secretary

were invalidated, a quorum of the Council composed of members duly

appointed as inferior officers by the head of a Department voted to

recommend the challenged amberjack catch limits; and

     d.    Plaintiffs raise a removal claim but did not identify how they

were harmed by the operation of the challenged removal restrictions, as

required by *Comm. Fin. Servs. Ass'n v. Cons. Fin. Prot. Bd.*,

51 F.4th 616 (5th Cir. 2022).

## PERTINENT CONSTITUTIONAL PROVISIONS, STATUTES, AND REGULATIONS

All pertinent constitutional provisions, statutes, and regulations are set forth in the Addendum following this brief.

## STATEMENT OF THE CASE

### A.    Statutory and regulatory background

#### 1.    The Magnuson-Stevens Fishery Conservation and Management Act

Congress enacted the Fishery Conservation and Management Act, Pub. L. No. 94-265, 90 Stat. 331 (1976), now known as the Magnuson-Stevens Act, to establish a comprehensive, national approach to managing fisheries within the United States' jurisdictional waters.[1] 16 U.S.C. § 1801. The Act establishes federal jurisdiction over fishery[2] resources within the United States' exclusive economic zone and provides for their conservation and management.

---

[1] Congress amended the Magnuson-Stevens Act several times, most prominently with the Sustainable Fisheries Act of 1996, Pub. L. No. 104-297, and the Magnuson–Stevens Fishery Conservation and Management Reauthorization Act of 2006, Pub. L. No. 109-479.

[2] A "fishery" is "one or more stocks of fish which can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, technical, recreational, and economic characteristics" and "any fishing for such stocks." 16 U.S.C. § 1802(13).

Congress recognized that fisheries are "valuable and renewable natural resources," the dangers of overfishing, and the economic significance of the coastal fisheries to the United States. *See* 16 U.S.C. § 1801(a)(1)–(3). Congress therefore sought "to take immediate action to conserve and manage the fishery resources found off the coasts of the United States," *id.* § 1801(b)(1), and "to promote domestic commercial and recreational fishing under sound conservation and management principles," *id.* § 1801(b)(3); *see also Delta Com. Fisheries Ass'n v. Gulf of Mex. Fishery Mgmt. Council*, 364 F.3d 269, 271 (5th Cir. 2004) (the Magnuson-Stevens Act "aims to preserve fishery resources by preventing overfishing"). With the Act, Congress established a "national program for the conservation and management of the fishery resources of the United States." 16 U.S.C. § 1801(a)(6). To do so, Congress set up a federal decisionmaking structure to provide "for the preparation and implementation … of fishery management plans which will achieve and maintain, on a continuing basis, the optimum yield from each fishery," *id.* § 1801(b)(4), and laid out the broad principles that would guide their management, *id.* §§ 1851–1856.

### a.   The role of the Secretary and the Regional Fishery Management Councils

The Magnuson-Stevens Act vests responsibility for managing the nation's fisheries in the Secretary:

> The Secretary shall have general responsibility to carry out any fishery management plan or amendment approved or prepared by him, in accordance with the provisions of this chapter. The Secretary may promulgate such regulations, in accordance with section 553 of Title 5, as may be necessary to discharge such responsibility or to carry out any other provision of this chapter.

16 U.S.C. § 1855(d).

To help the Secretary manage the nation's fisheries, Congress also established several regional advisory bodies—the Regional Fishery Management Councils (Regional Councils)—to help develop, and advise the Secretary on, regional fishery management plans. *See* 16 U.S.C. § 1852(a)(1). Each Council has responsibility for a specific geographic region and consists of federal officials, state officials, and individuals with relevant local expertise appointed by the Secretary. *Id.* § 1852; *see also id.* § 1852(a)(2) ("Each Council shall reflect the expertise and interest of the several constituent States in the ocean area over which such Council is granted authority."). Congress explained that the purpose of the Regional Councils is to "enable the States, the fishing

10

industry, consumer and environmental organizations, and other
interested persons to participate in, and advise on, the establishment
and administration of" fishery management plans so that such plans
"take into account the social and economic needs of the States." *Id.*
§ 1801(b)(5).

### b. The establishment of Fishery Management Plans

The Magnuson-Stevens Act's approach to fishery conservation and
management starts with fishery management plans. Fishery
management plans identify the "conservation and management
measures" that are "necessary and appropriate for the conservation and
management of the fishery, to prevent overfishing and rebuild
overfished stocks, and to protect, restore, and promote the long-term
health and stability of the fishery." 16 U.S.C. § 1853(a)(l). The Act sets
out a list of detailed requirements for each plan, *id.* § 1853(a)(l)–(15),
and identify additional provisions that plans may contain, *id.*
§ 1853(b)(l)–(14). The mandatory components include technical
assessments and specifications of the fisheries and their expected uses,
and the data relied on in the plan's formulation. *Id.* § 1853(a)(2)–(4).

Any fishery management plan or amendment must also be consistent with a framework of ten broadly written National Standards Congress enacted to govern federal fisheries conservation and management policy. 16 U.S.C. § 1853(a)(1)(C). Critically, these standards recognize the complex tradeoffs in fisheries management between economic development and sustainability and between the interests and perspectives of various fishery participants and stakeholders. *Id.* § 1851(a); *see* Addend. at 8a–9a. The Act further requires the Secretary to "establish advisory guidelines …, based on the national standards, to assist in the development of fishery management plans." *Id.* § 1851(b).

Congress established a structured process for the establishment, modification, and implementation of federal fishery management plans that relies on recommendations from the Regional Councils to ensure that the Secretary takes state and local views and interests into account. *See* 16 U.S.C. §§ 1852(h)(1), 1853, 1854(a) & (b). Congress directed the Councils to "prepare and submit to the Secretary" proposed fishery management plans for any fishery in their region that requires

conservation and management as well as such plan amendments as "are necessary from time to time." *See id.* § 1852(h)(1).

When the Secretary receives a Council-recommended fishery management plan or amendment, the Secretary reviews it, including "to determine whether it is consistent with the national standards, the other provisions of [the Magnuson-Stevens Act], and any other applicable law," 16 U.S.C. § 1854(a)(1)(A), and then publishes a notice of availability to solicit public comment, *id.* § 1854(a)(1)(B). Within 30 days of close of public comment, after "tak[ing] into account the information, views, and comments received from interested persons," *id.* § 1854(a)(2)(A), the Secretary makes a final decision whether to "approve, disapprove, or partially approve" the plan or amendment "by written notice to the Council." *Id.* § 1854(a)(3). If the Secretary "disapproves or partially approves a plan or amendment, the Council may submit a revised plan or amendment to the Secretary for review." *Id.* § 1854(a)(4).

The Secretary, on her own, may prepare a fishery management plan or "necessary amendment" without the predicate of a Regional Council proposal, if the Council fails to develop and submit a plan

13

necessary for fishery conservation or management in "a reasonable period of time," or if the Secretary disapproves of the plan submitted and the Council fails to appropriately revise it. 16 U.S.C. § 1854(c). Like the Council, the Secretary must "conduct public hearings" to collect public input. *Id.* § 1854(c)(2)(A). The Secretary must also submit the proposed plan or amendment to the relevant Council "for consideration and comment" and open a 60-day notice-and-comment period. *Id.* § 1854(c)(4). At the end of that period, the Secretary may adopt her own plan or amendment after considering the Council's input and public comment. *Id.* § 1854(c)(5).

### c.    The creation of legally binding fishery regulations

Fishery management plans are not self-executing—the plans are not enforceable without implementing regulations. *See N.C. Fisheries Ass'n v. Gutierrez*, 550 F.3d 16, 17 (D.C. Cir. 2008) (explaining that fishery management plans, even once approved by the Secretary, "do not themselves have any regulatory effect—implementing regulations must also be enacted in order to effectuate them"). The plans alone thus create no legally binding obligations for fishery participants.

Like fishery management plans, implementing regulations may originate with either the relevant Council or the Secretary. If the Regional Council believes that regulations would be "necessary or appropriate" to implement a fishery management plan or amendment, the Council may submit proposed regulations to the Secretary simultaneously with its proposed plan or amendment. 16 U.S.C. § 1853(c)(1). The Secretary reviews the proposed regulations, including for consistency with the relevant fishery management plan, the Magnuson-Stevens Act, and any other applicable law, and, if appropriate, publishes a proposed rule, solicits public comment, considers comments received, and ultimately promulgates any final rule. *Id.* § 1854(b). The Secretary may decline to publish the proposed rule, returning it to the Council for a revised proposal, *see id.* § 1854(b)(1)(B), or may revise the proposal herself before promulgating a final rule after "consult[ing] with the Council" and publishing "an explanation of any differences between the proposed and final regulations" in the Federal Register, *id.* § 1854(b)(3). Once the Secretary approves the proposed regulations, she must "promulgate final regulations within 30 days after the end of the comment period." *Id.*

The Secretary may also originate implementing regulations.
16 U.S.C. § 1854(c)(6) ("The Secretary may propose regulations in the
Federal Register to implement any plan or amendment prepared by the
Secretary."). The Secretary must submit the planned regulations to the
Council and open a comment period for 60 days. *Id.* As with Council-
proposed regulations, within 30 days after the comment period ends,
the Secretary must issue final regulations. *Id.* § 1854(c)(7). The
Secretary also has general authority to "promulgate such regulations …
as may be necessary" to discharge her responsibilities under the Act. *Id.*
§ 1855(d). The Act also empowers the Secretary to promulgate
"emergency regulations or interim measures necessary to address [an]
emergency or overfishing" when the Secretary finds that "an emergency
exists or that interim measures are needed to reduce overfishing." *Id.*
§ 1855(c)(1).

Federal fishery requirements only bind fishery participants once
NMFS has promulgated a final implementing rule. The Regional
Councils cannot promulgate regulations. *See id.* §§ 1852, 1854, 1855.

### 2.   Delegation of the Secretary's Magnuson-Stevens Act authorities to the Assistant Administrator for Fisheries

The Secretary has delegated her Magnuson-Stevens Act authorities to the Under Secretary of Commerce for Oceans and Atmosphere, a Presidentially appointed and Senate-confirmed official who oversees the National Oceanic & Atmospheric Administration. (ROA.9517-28.) The Under Secretary has in turn delegated certain Magnuson-Stevens Act authorities to the Assistant Administrator for Fisheries, currently Janet Coit, who oversees NMFS. (ROA.9529-40.) The Assistant Administrator is a duly appointed inferior officer of the United States. *See* Reorganization Plan No. 4 of 1970, 84 Stat. 2090, 2091 (1970) (providing that the Assistant Administrator "shall be appointed by the Secretary, subject to approval of the President"). (ROA.9551-52 (appointment and commission for Janet Coit).) She has the authority to promulgate regulations under the Magnuson-Stevens Act. *See Massachusetts v. Pritzker*, 10 F. Supp. 3d 208, 212, 212 n.4 (D. Mass. 2014).

B.    Factual background

1.    The Gulf of Mexico greater amberjack stock

Greater amberjack is a large ocean fish found in the Atlantic and Pacific Oceans. *See* NOAA Fisheries, *Species Directory: Greater Amberjack*, https://perma.cc/SM3P-US27. The Gulf amberjack stock has long been overfished. "In the Gulf of Mexico, fishing rates were too high and the stock was declared overfished in 2001." *Ibid*. The Secretary therefore implemented a rebuilding plan for Gulf amberjack by Secretarial amendment in 2003. *See Rebuilding Plan for Greater Amberjack in the Gulf of Mexico*, 68 Fed. Reg. 39898 (July 3, 2003), https://perma.cc/L2TH-93BC. This plan originally sought to rebuild the amberjack stock by 2010, but ongoing assessments showed that amberjack continued to be overfished and to experience overfishing. *See Amendment 54 to the Reef Fish Fishery of the Gulf of Mexico*, 88 Fed. Reg. 39193, 39194 (June 15, 2023), https://perma.cc/3P2N-WFTP (Final Rule). The fishery management plan was amended several times from 2006 to 2018 to facilitate the rebuilding of the Gulf amberjack stock, including by promulgation of commercial and recreational annual catch limits and annual catch targets. *Ibid*. Notwithstanding these

efforts, assessments continued to show that Gulf amberjack remained overfished, were experiencing overfishing, and would not meet rebuilding targets. *Ibid.*

### 2.    Amendment 54

A new assessment of the status of the Gulf amberjack stock completed in November 2020 again showed that the stock "continued to be overfished" and "undergoing overfishing," but found that the stock could still be rebuilt by 2027 as planned "with reduced yields." Final Rule, 88 Fed. Reg. at 39194. On April 7, 2021, NMFS notified the Gulf Council of this assessment and asked the Council to prepare a proposed amendment and implementing regulations to end overfishing and allow amberjack stock to rebuild. (ROA.9036.)

Following review, analysis, discussion, and public hearings regarding rebuilding amberjack stock, in October 2022, the Gulf Council approved a recommended amendment, "Draft Amendment 54: Modifications to the Greater Amberjack Rebuilding Plan, Catch Limits, and Sector allocations …," and proposed regulations to implement the amendment. (ROA.4721-23; ROA.4892-94.) The draft amendment proposed revisions to the overfishing limit, the acceptable biological

catch, the total annual catch limit, and sector annual catch limits. It also revised the allocation of the total annual catch limit between the recreational and commercial sectors to better align with historical data regarding landings. The Gulf Council conveyed its proposed amendment to NMFS on January 17, 2023. (ROA.9037-38.)

After reviewing the proposed amendment, NMFS published a notice of availability for Amendment 54 to the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico[3] (Amendment 54) and requested public comment. 88 Fed. Reg. 13077 (March 2, 2023). After considering all public comments received, the Assistant Administrator approved Amendment 54 on May 26, 2023. (ROA.9455.) NMFS notified the Gulf Council of the approval of Amendment 54 on May 30, 2023. (ROA.9516.)

---

[3] The Secretary first approved and implemented the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico in 1984 to rebuild declining reef fish stocks and support the sustainable use of reef fish resources in the Gulf of Mexico. 49 Fed. Reg. 39548 (1984). It covers many fish species, including the greater amberjack at issue. *Id.* at 39554.

### 3.    Final Rule

The Gulf Council also recommended proposed regulations to implement Amendment 54. (ROA.9037-38.) After review, NMFS decided to publish a notice of proposed rulemaking to implement Amendment 54 in the Federal Register and solicited public comment. 88 Fed. Reg. 14964 (March 10, 2023). Ultimately, after considering the public comments, the Assistant Administrator approved the rule implementing the revised amberjack catch limits, and NMFS promulgated the final rule. Final Rule, 88 Fed. Reg. 39193.

The Final Rule establishes new quotas and new annual commercial and recreational catch limits for Gulf amberjack. *Id.* at 39201. The Final Rule also revises the allocation of the overall annual catch limit between the commercial and recreational sectors based on revised data regarding historical landings. *Id.* at 39195. NMFS addressed the comments received both on the notice of availability regarding Amendment 54 and on the proposed implementing rule, which were primarily supportive but raised some concerns regarding the sector reallocation. *Id.* at 39195–98.

NMFS also responded to comments raising the Appointments Clause issues advanced in this litigation. NMFS explained that the commenters

> misunderstand the function and authority of the Council, which is neither an "unaccountable" or "illegally constituted" body. The Magnuson-Stevens Act establishes the Council structure in order for state officials, fishermen, scientists, and other stakeholders to provide important expert input on fishery management. But *the Council acts as an advisory body only*: authority to issue Federal regulations to implement fishery management measures that impact fishermen is vested solely in the Secretary of Commerce.

*Id.* at 39198 (emphasis added). The Final Rule adds that "NMFS, acting through delegated authority from the Secretary, retains significant discretion to reject Council recommendations, including the proposed regulations that the Council submitted to NMFS to implement Amendment 54." *Ibid.*

C.    Proceedings below

George D. Arnesen and Jeffrey Ryan Bradley (the *Arnesen* Plaintiffs) filed a complaint in the U.S. District Court for the Southern District of Mississippi against Federal Defendants seeking declaratory and injunctive relief setting aside Amendment 54 and the Final Rule implementing it and enjoining the Gulf Council from preparing future proposals for annual catch limits for the greater amberjack fishery. (ROA.24-82.) Karen Bell, A.P. Bell Fish Company, Inc., and William Copeland (the *Bell* Plaintiffs)[4] likewise filed suit against certain Federal Defendants seeking declaratory and injunctive relief setting aside and enjoining the enforcement of the Final Rule. (ROA.10797-813.) The district court consolidated the two cases. (ROA.668-69.)

Following briefing, the district court granted Federal Defendants' cross-motion for summary judgment. (ROA.10631-73 (Order).) After concluding Plaintiffs had standing, (ROA.10631-40 (Order at 13–22)), the district court concluded that the members of the Gulf Council were officers of the United States, (ROA.10640-44 (Order at 22–27)). The

---

[4] This consolidated answering brief will refer to the *Arnesen* Plaintiffs or the *Bell* Plaintiffs specifically where appropriate and will use "Plaintiffs" generally to refer to them collectively.

court nonetheless granted Federal Defendants summary judgment after determining that any constitutional infirmities in the make-up of the Gulf Council were not the proximate cause of Plaintiffs' injury because of the independent decision of the Assistant Administrator, duly authorized to exercise the Secretary's Magnuson-Stevens Act authorities, to approve and execute the proposed amberjack catch limit. (ROA.10659-62 (Order at 41–44).) The district court also alternatively held that the Gulf Council's action in proposing Amendment 54 was lawful because a duly appointed quorum of the Council—the eleven Secretarially appointed members—had voted for the amendment 10–1. (ROA.10662-69 (Order at 44–51).) Plaintiffs timely appealed.[5]

---

[5] The *Arnesen* Plaintiffs also argued below that the Final Rule was invalid because the official who signed the Rule for publication in the Federal Register was not a duly appointed officer. The district court rejected this argument because the Rule was approved by the Assistant Administrator, a duly appointed officer, and Plaintiffs failed to explain how signing the Federal Register notice involved the employee in that approval process or transformed him into the "issuer" of the Rule. (ROA.10639-40 (Order at 21–22).) The *Arnesen* Plaintiffs have not addressed these claims in their opening brief and therefore forfeited them on appeal. *Vernon Smith v. School Bd. of Concordia Par.*, 88 F.4th 588, 594 (5th Cir. 2023).

## SUMMARY OF ARGUMENT

1.    As a threshold matter, only a subset of Plaintiffs' claims were properly before the district court. The federal courts lack jurisdiction over the *Arnesen* Plaintiffs' claims for direct relief against Amendment 54 and against the Gulf Council and its members. Congress waived sovereign immunity only for judicial review of Magnuson-Stevens Act claims challenging "[r]egulations promulgated by the Secretary" and "actions that are taken by the Secretary under regulations which implement a fishery management plan." 16 U.S.C. § 1855(f)(1)–(2). These terms govern when courts can review Magnuson-Stevens Act claims and they preclude claims, like Plaintiffs', directly against fishery management plans or amendments, which have no legally binding effect on fishery participants, or for relief against actors not exercising the Secretary's authorities under the Act.

2.    Plaintiffs' claims fail on the merits.

a.    The Assistant Administrator's discretion to make an independent decision to implement the challenged amberjack catch limits was not constrained by the Gulf Council's recommendations. The Magnuson-Stevens Act conveys broad authority and responsibility over

federal fisheries management to the Secretary. 16 U.S.C. § 1855(d). The
Act creates a structured process that ordinarily ensures that the
Secretary is informed of state and local equities through regional
advisory bodies, the Regional Councils, before she establishes or
modifies a fishery management plan or promulgates implementing
regulations. The Secretary retains final say over the contents of fishery
management plans, *id.* § 1854(a)(3), and has authority to take action if
the Regional Councils fail to do so, *id.* § 1854(c). Moreover, fishery
management plans do not have any binding legal effect on fishery
participants, and only the Secretary can promulgate binding fishery
regulations. It is the Secretary who has final say over the terms of any
final rule implementing federal fisheries policies and thereby legally
binding fishery participants, after consulting with the Council and
providing an explanation for any changes to the Council's proposed
regulation, *id.* § 1854(b)(3).

b.      The Regional Councils, by contrast, play an advisory role
only. Congress charged the Councils to "prepare and submit" proposed
plans, amendments, and implementing regulations to the Secretary.
16 U.S.C. § 1852(h)(1). But these proposals are advisory only; the

Secretary retains the final word on the contents of any approved fishery management plan or promulgated final rule. Congress provided both textual indications, *see id.* §§ 1801(b)(5), 1852(i)(1), and structural signs, *see id.* §§ 1854(a)(1)(B) & (b)(1)(A), of the Council's advisory function.

c.    Given these respective roles, members of the Regional Councils are not officers of the United States because they do not exercise significant federal authority. No action taken by a Regional Council can legally bind fishery participants. Instead, the Councils provide advice to the Secretary, who must take affirmative action to promulgate binding regulations, and who has discretion under the Act over the terms of those regulations. Plaintiffs cite several other provisions of the Act not at issue in connection with the amberjack catch limits challenged here and claim those provisions convey significant federal authority to the Councils. But none of those provisions authorizes the Regional Councils to take any legally binding action. The Magnuson-Stevens Act is thus properly read not to confer any significant federal authority on members of the Regional Councils, and Council members accordingly are not officers of the United States.

d.    This is the best reading of the Act, but even if there were
ambiguity, constitutional avoidance would lead to the same result. At a
minimum, it is fairly possible to read the Act to assign the Regional
Councils an advisory role, and so the canon of constitutional avoidance
favors adopting such a reading, rather than construing the Act in a
manner that manufactures constitutional conflict.

3.    If the Court nevertheless concludes that the Act
unambiguously authorizes the Regional Councils to constrain the
Secretary's discretion in a manner that constitutes significant federal
authority, vacatur of the challenged Final Rule still would not be
proper, for four reasons.

a.    First, the appropriate remedy for any constitutional flaw in
the Magnuson-Stevens Act would be to sever those provisions of the
statute restricting the Secretary's discretion. This approach follows the
Supreme Court's direction when confronting a constitutionally flawed
statute to disregard "problematic portions while leaving the remainder
intact." *United States v. Arthrex, Inc.*, 594 U.S. 1, 23 (2021). This
"tailored approach" would be the narrowest possible modification that
would preserve the core of the Magnuson-Stevens Act—the structured

advisory process using the Regional Councils—while curing any constitutional defect. The Act would continue to function as an independent and fully operative law, and it would provide a valid basis for the Secretary's promulgation of the amberjack catch limit.

Such an approach would be consistent with recent Supreme Court decisions, including an Appointments Clause challenge when the Court severed limitations on a principal officer's supervision of an inferior officer to cure a potential Appointments Clause violation. *Arthrex*, 594 U.S. at 25. Plaintiffs' alternative proposal—an invitation to wholesale invalidation of most of the Act—violates the Supreme Court's direction not to "nullify more of a legislature's work than is necessary." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006).

b.    Second, even assuming that there is some constitutional infirmity in the appointment of the members of the Gulf Council, Plaintiffs have not established that any such infirmity is the cause of any injury they suffer. Plaintiffs' injury instead flows from the Final Rule promulgated by the Assistant Administrator. Her independent decision to approve Amendment 54 and promulgate the Final Rule effectively operates as a ratification of the amberjack catch limits by a

duly appointed officer with authority to do so, even if the Council's recommendation were infirm. Indeed, the Magnuson-Stevens Act would have obligated the Secretary to act to address overfishing and facilitate rebuilding of the amberjack stock if the Council's proposals were invalid. *See* 16 U.S.C. § 1854(e)(5).

c.    Third, eleven of the Gulf Council's members were appointed by the head of a Department (the Secretary), and so are duly appointed inferior officers. These eleven members constitute a quorum of the Council and voted 10-1 in favor of recommending Amendment 54 and its implementing regulations. This is an additional reason that Plaintiffs cannot show that any constitutional infirmity in the Council caused them harm. That the Secretary's appointees were selected from a list of qualified individuals recommended by State governors does not undermine the validity of their appointments. The Secretary establishes the qualifications for the positions, must be presented with a reasonable range of qualified options to appoint, and retains discretion to appoint only those candidates with whom she is satisfied.

d.    Finally, the Court need not reach *Arnesen* Plaintiffs' removal claim because Council members are not officers of the United

States exercising significant federal authority. But regardless, this Court has held that "Plaintiffs must demonstrate that the unconstitutional removal provision *caused them harm.*" *Comm. Fin. Servs. Ass'n*, 51 F.4th at 631–33 (emphasis added). Plaintiffs have failed to make this required showing of harm resulting from some nexus between the removal restrictions and the challenged action.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo*. *Burell v. Prudential Ins. Co. of Am.*, 820 F.3d 132, 136 (5th Cir. 2016). This Court is not limited to the grounds the district court offered for its judgment. An appellee may defend a judgment on any ground supported by the record, including one rejected by the district court. *See United States v. Am. Ry. Express Co.*, 265 U.S. 425, 435 (1924); *Hoyt R. Matise Co. v. Zurn*, 754 F.2d 560, 565 n.5 (5th Cir. 1985).

# ARGUMENT

## I.    The federal courts lack jurisdiction to consider certain of Plaintiffs' claims.

The Magnuson-Stevens Act expressly provides for judicial review only of "[r]egulations promulgated *by the Secretary*" and "actions that are taken *by the Secretary* under regulations which implement a fishery management plan." 16 U.S.C. § 1855(f)(1)–(2) (emphasis added). While the *Bell* Plaintiffs accordingly challenge only the Final Rule, the *Arnesen* Plaintiffs' claims exceed Congress's carefully drawn limits in section 1855(f). They seek relief directly against a fishery management plan amendment, Amendment 54, which is not a regulation that binds fishery participants. (*See* ROA.80-81 (seeking relief declaring Amendment 54 "unlawful, unenforceable, and void" and "[v]acating Amendment 54").) And they seek relief that would operate directly against the Council members. (*See* ROA.81 (asking the court to permanently enjoin the voting members of the Council "from developing further annual catch limits for the greater amberjack fishery").)

Section 1855(f) effects a limited waiver of the United States' sovereign immunity for certain Magnuson-Stevens Act claims. These limits govern when plaintiffs have a right of action to litigate

complaints about the federal government's implementation of the Act's requirements. The contours of section 1855(f) likewise govern when federal courts have jurisdiction to consider such claims. As this Court has recognized, the terms of a statute effecting a limited waiver of sovereign immunity govern when the United States can be sued.[6] *See, e.g., Alabama-Coushatta Tribe of Texas v. United States*, 757 F.3d 484, 488 (5th Cir. 2014) ("Where the United States has not consented to suit or the plaintiff has not met the terms of the statute the court lacks jurisdiction and the action must be dismissed.") (citation omitted); *see also ibid.* ("A waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign."). The *Arnesen* Plaintiffs' claims do not satisfy the elements of a claim under section 1855(f), and the courts lack jurisdiction to consider them.

That the *Arnesen* Plaintiffs purport to raise constitutional claims does not affect this conclusion. Because only regulations promulgated by the Secretary have any binding legal effect on private parties,

---

[6] The Regional Councils, although not "agencies" for Administrative Procedure Act purposes, are an establishment of the United States created by Congress, 16 U.S.C. § 1852(a), and therefore cannot be sued absent an applicable waiver of sovereign immunity.

section 1855(f) provides an avenue for any plaintiff actually harmed by agency action under the Magnuson-Stevens Act to obtain relief. *See* 16 U.S.C. § 1855(f)(1)(B) (incorporating 5 U.S.C. § 706(2)(B), permitting the court to set aside any Secretarial order or action that is "contrary to constitutional right, power, privilege, or immunity").

For that reason, the Court's general equity authority does not create a right of action that can evade these congressionally imposed limits. (*Contra* ROA.73-79 (*Arnesen* Compl. ¶¶ 139, 151, 158).) While "serious constitutional questions" might arise if the Magnuson-Stevens Act "were construed to deny *any* judicial forum for a colorable constitutional claim," *Webster v. Doe*, 486 U.S. 592, 603 (1988) (emphasis added), that is not the case here. Plaintiffs cannot invoke equity to circumvent Congress's decision to appropriately channel such judicial review. *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327–29 (2015). Sovereign immunity thus requires dismissal of the *Arnesen* Plaintiffs' claims seeking relief directly against Amendment 54 and against the Gulf Council and its members, and whatever may survive of the *Arnesen* Plaintiffs' claims, at a minimum, the Gulf Council and its members must be dismissed as defendants.

## II.   The Final Rule imposing the greater amberjack catch limit is lawful.

Plaintiffs' Appointments Clause challenge rests on a fundamental misunderstanding of the Magnuson-Stevens Act and the role of the Regional Councils. Plaintiffs' claims fail because the Final Rule results from independent decisionmaking by the Assistant Administrator. It is the Assistant Administrator, a properly appointed inferior officer, who alone exercises "significant discretion" in "carrying out the[] important functions" associated with developing federal fishery management policy. *Freytag v. Comm'r*, 501 U.S. 868, 882 (1991). The Councils are advisory bodies only; they have no authority to take any action that legally binds fishery participants. The Act vests authority to issue binding federal regulations to implement fishery management measures solely in the Secretary. The exclusive authority of the Secretary to give federal fishery policies legal effect is dispositive. And if there were any question on this score, the Court should read the Act to avoid constitutional doubts. The Final Rule is lawful, and the manner of its adoption is consistent with the Appointments Clause.

## A.   The Magnuson-Stevens Act gives the Secretary final word on the content of fishery management plans and final implementing rules.

The Assistant Administrator decided to approve Amendment 54 and promulgate the Final Rule. Plaintiffs argue that the Magnuson-Stevens Act improperly limited her discretion to depart from the Gulf Council's recommendations and reach her own judgment. But Plaintiffs misread the relevant provisions of the Act.

The Act establishes a structured process to ensure that the Secretary ordinarily considers state and local equities before setting the terms of a fishery management plan or deciding how to implement a plan by regulation. Once so informed, the Secretary remains free to decide how best to execute Congress's mandates for federal fisheries policy. The Act affords the Secretary discretion to decide whether to approve or disapprove a Council-recommended fishery management plan or amendment and, moreover, separately gives the Secretary the final word on the contents of any binding final implementing rule.

1.    **The terms of the Magnuson-Stevens Act do not limit the Secretary's review.**

The Magnuson-Stevens Act gives the Secretary broad responsibility and authority to implement the Act's requirements. Congress expressly assigned the Secretary "general responsibility to carry out any fishery management plan or amendment approved or prepared by [her]" and authorizes her to "promulgate such regulations, in accordance with section 553 of title 5," United States Code, "as may be necessary to discharge such responsibility or to carry out any other provision of this [Act]." 16 U.S.C. § 1855(d). This broad regulatory authority to carry out federal fisheries policy and to promulgate any necessary implementing regulations makes clear that the Secretary is ultimately responsible—and politically accountable—for how the requirements of the Act are executed.

Congress also recognized the considerable importance of fisheries to state and local economies; the significant differences among regional fisheries in terms of participants, ecosystems, and environmental challenges; and the need for coordination between federal and state agencies managing a resource that can swim between federal and state

waters.[7] Congress therefore established a structured process typically used to develop federal fisheries policy, ensuring that the Secretary is aware of state and local views and interests when setting policy.

The Act creates procedural requirements that the Secretary typically follows to gather input about state and local equities before she establishes and implements federal fisheries policies. But these *procedural* requirements do not constrain the Secretary's judgment on *substance*—that is, on how best to conserve and manage federal fisheries consistent with Congress's direction in the Act. Absent an emergency, delay, or other necessity, the Secretary may have to consider a Council's proposal before taking action, but she never has to uncritically accept the content of the Council's recommendations. Along with the broad general responsibilities and authorities of the Secretary, *see* 16 U.S.C. § 1855(d), this can be seen in the specific authorities the Act assigns the Secretary in evaluating and implementing Council proposals, *see id.* § 1854(a)(3), (b)(3).

---

[7] States generally have authority to regulate fishing activities within three miles of shore, sometimes extended to nine miles. *See* Submerged Lands Act, 42 U.S.C. §§ 1301 (defining "boundaries" and "natural resources"), 1311(a) (rights of States), and 1312 (States' seaward boundaries) (2000).

When a Regional Council recommends a fishery management plan or amendment, the Secretary has a full range of discretion to "approve, disapprove, or partially approve" the Council's proposal. 16 U.S.C. § 1854(a)(3). If the Secretary "disapproves or partially approves a plan or amendment, the Council may submit a revised plan or amendment to the Secretary for review." *Id.* § 1854(a)(4). The Act also empowers the Secretary to prepare a fishery management plan herself without input from a Council if the Council fails to timely develop and submit a plan or if the Secretary disapproves the plan submitted. *Id.* § 1854(c).

The statutory text does not limit the factors the Secretary may consider in deciding whether to approve, disapprove, or partially approve plans. To be sure, the Magnuson-Stevens Act requires the Secretary to review Council-recommended fishery management plans and amendments for consistency "with the national standards, the other provisions of [the] Act, and any other applicable law."[8] *See*

---

[8] Other applicable law includes, but is not limited to, the Endangered Species Act, Marine Mammal Protection Act, National Environmental Policy Act, Regulatory Flexibility Act, Administrative Procedure Act, and tribal treaty rights. *See Magnuson Act Process, Table X* at pdf p. 31, National Oceanic and Atmospheric Administration (Oct. 25, 2017), https://perma.cc/H7SV-3QS9.

16 U.S.C. § 1854(a)(1); *id.* § 1854(a)(3) (upon disapproval or partial disapproval of a plan or amendment, requiring the Secretary to specify for the Council the "applicable law" with which the proposal is inconsistent and make "recommendations" on how the Council might conform the action to that law). But it does not follow, as Plaintiffs argue, that the Act instead gives the Secretary a merely ministerial role and requires the Secretary to rubberstamp Council-recommended fishery management plans and amendments unless they violate an express legal requirement. (*Bell* Br. at 20.)

Notably absent from Plaintiffs' assertion that "[i]f the plan or amendment is lawful, the Secretary must approve it," (*Bell* Br. at 5), is any citation to the statutory text. Plaintiffs later try to address this lacuna by manufacturing the language they want to be in the Act, quoting only the word "shall" and inserting their own requirements— rather than Congress's—around it. (*See Bell* Br. at 25 (claiming the Act says, "Council measures 'shall' be approved and implemented if they are lawful.").) But the closest language to that in the Act says only that "[t]he Secretary *shall approve, disapprove, or partially approve*" a plan

or amendment in 30 days, *see* 16 U.S.C. § 1854(a)(3) (emphasis added). This does not limit the Secretary's full discretion.

True, section 1854(a)(3) does require that the Secretary's notice of disapproval or partial approval "specify . . . the applicable law with which the plan or amendment is inconsistent." But it does not say that the Secretary may not disapprove absent such an inconsistency. Nor does it make sense to think Congress intended a provision that reads as a reporting requirement to instead operate as a direct limitation on the Secretary's authority. Comparison to the language of section 1854(b)(1), which governs when the Secretary must solicit public comment on proposed rules, provides a notable contrast. That provision, unlike section 1854(a)(3), squarely says that the Secretary "shall … initiate an evaluation of the proposed regulations to determine whether they are consistent with the fishery management plan, plan amendment, this chapter, and other applicable law," and "if that determination is affirmative, the Secretary shall publish" the proposal for public comment. This provision, which addresses only publishing a proposed rule, does not include the sort of consequences that courts usually require to find such mandatory-seeming language directed at public

42

officials to be enforceable rather than merely stating a procedural
condition. *See McIntosh v. United States*, 144 S. Ct. 980, 987–89 (2024).
But this language nevertheless shows Congress knew how to draft a
provision directing action, and differs from the formulation Congress
chose for section 1854(a)(3).

In any event, fishery management plans do not legally bind
fishery participants. Only the Secretary can promulgate binding
regulations implementing a plan or amendment. And it is, if anything,
even more apparent that the Act does not expressly (or otherwise) limit
the Secretary's discretion to revise the Council's proposed regulations
before promulgating a final rule. When a Regional Council recommends
proposed regulations to implement a plan or amendment, the Secretary
reviews the proposed regulations, including for consistency with the
relevant fishery management plan, the Magnuson-Stevens Act, and any
other applicable law, and, if appropriate, publishes proposed rules,
solicits public comment, considers comments received, and ultimately
promulgates any final rule. 16 U.S.C. § 1854(b). If the Secretary
disagrees with the Council's proposal, she may either decline to publish
the proposed rule and return it to the Council for revision, *see id.*

§ 1854(b)(1)(B), or revise the regulations herself before promulgating a final rule after "consult[ing] with the Council" and publishing "an explanation of any differences between the proposed and final regulations" in the Federal Register, *id.* § 1854(b)(3).

These provisions make clear the Secretary has ultimate discretion over the contents of any implementing regulations. The terms of the Act do not limit her discretion to revise the Council's proposal. Instead, the Act imposes only procedural requirements to consult with the Council and provide an explanation of any changes. As other courts have recognized, power to alter a proposed rule before it becomes binding on fishery participants "rests only with the Secretary." *Fishing Co. of Alaska v. Gutierrez*, 510 F.3d 328, 333 (D.C. Cir. 2007) (citing 16 U.S.C. § 1854(b)(3)) (explaining that "[t]he Council is free to submit comments on a proposed rule (as are others), but power to alter the rule before it becomes final rests only with the Secretary"). The Secretary's decision to revise (or not revise) a proposed rule may be declared invalid only if "the Secretary acts in an arbitrary and capricious manner in promulgating [the] regulations." *Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1460 (9th Cir. 1987).

Plaintiffs suggest that, by requiring the Secretary to consult with the Regional Council before finalizing a rule that departs from a Council-proposed implementing regulation, and also requiring the Secretary to issue final regulations within 30 days of the end of the comment period, *see* 16 U.S.C. § 1854(b)(3), Congress meant to give the Councils a back-door mechanism to compel the Secretary to issue a rule without alterations. In Plaintiffs' view, "the Council may simply deny consultation for that 30-day period" and then NMFS has no choice but to promulgate the Council's proposed regulation without revision. (*Bell Br.* at 28.) The text simply does not say that. Congress did not, by directing NMFS to attempt consultation, give the Councils a unilateral pocket veto. If Congress meant to give the Councils a way to prevent the Secretary from revising its proposed regulations, it would have just said so, rather than taking such an "oblique [and] elliptical" approach. *West Virginia v. Env. Prot. Agency*, 597 U.S. 697, 723 (2022).

At any rate, Plaintiffs' position rests on a misrepresentation of the Government's position in another district court matter[9] and ignores

---

[9] Plaintiffs claim that the Government "argued" that the Secretary was compelled to promulgate the original proposed regulation when he was unable to consult with the Council within 30 days in *Oceana, Inc. v.*

governing law. "Time-related directives seek speed by directing a judge or other public official to act by a certain time. Missing that kind of deadline does not deprive the official of the power to take the action to which the deadline applies." *McIntosh*, 144 S. Ct. at 987–88. Thus Fifth Circuit precedent provides that "a statutory time period" like the 30-day limit "is not mandatory unless it both expressly requires an agency or public official to act within a particular time period and imposes a consequence for failure of compliance." *Meliezer v. Resolution Tr. Co.*,

---

*Ross*, No. 17-cv-05146, ECF No. 124, at 2–3 (C.D. Cal. Nov. 18, 2019). (*Bell* Br. at 28.) That is incorrect. The district court there ordered NMFS both (1) to publish final regulations by a date certain and (2) to consult the Council before making any revisions to the proposed regulations. *Id.* at 7. As NMFS explained in its final rule, because the Council did not meet until after the date by which *the district court* ordered NMFS to publish the final rule, it "d[id] not have an opportunity to consult with the Council on revisions to the regulations *before the Court's deadline.*" 85 Fed. Reg. 7246, 7247 (Feb. 7, 2020) (emphasis added). Indeed, NMFS added that it was "soliciting public comment on this final rule to gather information that can be used to develop [] a separate rulemaking" that it would engage in after "publishing the rule" in "accord with the [court] order." *Id.*

If the Secretary's discretion was constrained in *Oceana*, it was by a judicial order, not the Magnuson-Stevens Act. Indeed, a D.C. district court ultimately vacated that final rule, noting that NMFS had concluded before publishing the rule that it was inconsistent with National Standard 7, but promulgated it "*only to comply with the California district court's order*[.]" *Burke v. Coggins*, 521 F. Supp. 3d 31, 38–39 (D.D.C. 2021) (emphasis added).

952 F.2d 879, 883 (5th Cir. 1992). That is not the case here, and this
provision does not compel the Secretary to promulgate a rule with
which she disagrees even if a Council rebuffs her attempts to consult.

In short, the Act imposes no standard of review on the Secretary,
much less one deferential to the Council's views. She is not "limited to
something like an abuse-of-discretion review." *See Flaherty v. Ross*, 373
F. Supp. 3d 97, 109 (D.D.C. 2019) ("Plaintiffs appear to operate on the
assumption that the Secretary's ability to review those proposals is
somehow circumscribed and limited to something like an 'abuse-of-
discretion' review. Nothing in § 1854 or elsewhere in [the Act]
prescribes as much."). Plaintiffs' argument that with these provisions,
Congress intended, *sub silentio*, to compel the Secretary to approve
Council-proposed measures notwithstanding significant policy
disagreement fatally overreads the Act's plain text.

The extra-textual limitations that Plaintiffs read into the
Magnuson-Stevens Act are difficult to reconcile with the Act's broader
structure. Congress has expressly assigned the Secretary broad
regulatory authorities and responsibilities to implement the Act, *see*,
*e.g.*, 16 U.S.C. § 1855(d); provided the Secretary authority to act if the

Council fails to recommend an appropriate plan, *see id.* § 1854(c); and included multiple textual indications that the Councils are meant to play an advisory role only, *see* Part II.B., *infra*. And Plaintiffs' approach—reading extra-textual limitations into a statute and then arguing that those limits render the statute unconstitutional—runs directly counter to the courts' duty when interpreting statutes. Courts construe statutes to avoid constitutional problems, not to seek them out. *See United States v. Hansen*, 599 U.S. 762, 781 (2023) ("When legislation and the Constitution brush up against each other, our task is to seek harmony, not to manufacture conflict."). *See* Part II.D., *infra*.

> ### 2.   Even if the Secretary's review were limited to consistency with the National Standards and applicable law, the Secretary would still retain ultimate policy discretion over fishery management plans.

Even if Plaintiffs were correct that the Magnuson-Stevens Act is best read to limit the Secretary's review of Council-proposed fishery management plans or amendments to consistency "with the national standards, the [Magnuson-Stevens Act], and any other applicable law," 16 U.S.C. § 1854(a)(1), the Secretary—not the Councils—would still retain ultimate policy discretion when approving plans or amendments,

all this before she exercises her plenary discretion over the final terms of implementing regulations. Evaluation of whether a plan or amendment is consistent with the National Standards is an inherently policy-laden judgment that necessarily involves the exercise of significant discretion. When the Secretary applies the National Standards, she must make judgments about how to balance competing interests, such as

- What conservation and management measures will best "prevent overfishing" while also "achieving, on a continuing basis, the optimum yield" from each fishery for the domestic fishing industry? 16 U.S.C. § 1851(a)(1).

- To what extent is it "practicable" to manage an "individual stock of fish" as a single unit throughout its range? *Id.* § 1851(a)(3).

- What allocation of fishing privileges is "fair and equitable" to domestic fishing interests; is "reasonably calculated to promote conservation"; and ensures that no one person or entity "acquires an excessive share of such privileges"? *Id.* § 1851(a)(4).

- When is it "practicable" to consider efficiency in the use of fishery resources when establishing conservation and management measures? *Id.* § 1851(a)(5).

- How can conservation and management measures best "minimize costs and avoid unnecessary duplication"? *Id.* § 1851(a)(7).

- How can conservation and management measures best "take into account the importance of fishery resources to fishing

communities" while also remaining consistent "with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks)"? *Id.* § 1851(a)(8).[10]

Considering the sorts of questions the Secretary must resolve when evaluating consistency with the National Standards underscores that she is the one responsible and accountable for the policy discretion and judgment embodied in any given plan or amendment. For example, National Standard 1 requires that fishery management seek "optimum yield," which is based not only on conservation but also requires "balancing the various interests that comprise the greatest overall benefits to the Nation," as limited by the restriction that optimum yield "must prevent overfishing." *See* 16 U.S.C. § 1851(a)(1); 50 C.F.R. § 600.310(b)(2)(ii). Assessing whether any Regional Council-recommended proposal is consistent with National Standard 1 therefore requires the Secretary to evaluate and balance conservation and exploitation of fishery resources. The same is true when the Secretary applies any of the Standards or weighs the interplay among them.

---

[10] The Secretary has published guidelines that describe her interpretation of the National Standards. *See* 16 U.S.C. § 1851(b); 50 C.F.R. § 600.305–600.355.

Courts have repeatedly recognized the Secretary's "discretion and judgment" inherent in reconciling the disparate concerns and tensions contained within and among the National Standards. *See State of New York v. Raimondo*, 84 F.4th 102, 107 (2d Cir. 2023) ("The national standards' expansive text and structure reflect that Congress intended for [] *NMFS* to use discretion and judgment to reconcile this tension when managing the fishery.") (emphasis added) (cleaned up); *Lovgren v. Locke*, 701 F.3d 5, 34 (1st Cir. 2012) ("The purposes of the national standards are many, and can be in tension with one another. … Compliance with the national standards requires balancing *by the agency* and the exercise of discretion and judgment.") (emphasis added); *All. Against IFQs v. Brown*, 84 F.3d 343, 349–50 (9th Cir. 1996) ("Congress required *the Secretary* to exercise discretion and judgment in balancing among the conflicting national standards.") (emphasis added). Courts have therefore understood the Magnuson-Stevens Act to give "NMFS rulemaking flexibility to react to dynamic natural conditions and account for multiple stakeholders." *State of New York*, 84 F.4th at 107. The language Congress uses in the National Standards—"optimum," "where practicable," "minimize," "take into

account"—reinforces this understanding because those words presume

the exercise of discretion and judgment in balancing different

considerations. *See Conservation Law Foundation v. Ross*, 374

F.Supp.3d 77, 91 (D.D.C. 2019).[11]

Plaintiffs are simply wrong that the Secretary is required to defer

to the judgment of the Regional Councils on how to balance the

competing objectives contained in the National Standards. (*Bell* Br.

at 20–22.) Again, the statutory text nowhere imposes such a

---

[11] For these reasons, Plaintiffs' reliance on *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007), is misplaced. (*See Bell* Br. at 23–24.) As noted by the Supreme Court, unlike the National Standards, the requirement at issue in that case— the transfer of permitting authority to state regulators upon application under section 402(b) of the Clean Water Act—was "mandatory" if nine statutory criteria regarding the regulator's legal authority were met. *Id.* at 654. The Environmental Protection Agency had determined that the statutory criteria were met. *Ibid.* Because "[b]y its terms, the statutory language is mandatory and the list exclusive," the Court rejected plaintiffs' claim that the agency also had to consult under section 7 of the Endangered Species Act. *Id.* at 661. The Court recognized that the agency "may exercise some judgment in determining whether a State has demonstrated the authority to carry out § 402(b)'s enumerated statutory criteria," but affirmed the agency's position that it could not add an additional Endangered Species Act requirement to the list. *Id.* at 671. Section 402(b)'s requirements are objective criteria regarding the legal powers of state agencies under state law, *see* 33 U.S.C. § 1342, not the sorts of policy-laden judgments the National Standards call for. And even in that context, the Court recognized the agency's ability to exercise judgment over whether the standards were met.

requirement. Instead, Congress established ten broad objectives for federal fishery conservation and management and entrusted the Secretary with discretion to faithfully execute Congress's mandate.

Besides, in addition to exercising her judgment in applying the National Standards to fishery management plans and amendments, the Secretary still has full control over the contents of any binding regulations implementing any plan or amendment. Plaintiffs' argument (like the district court's analysis) conflates fishery management plans with implementing regulations. Fishery management plans or amendments do not, themselves, have any binding legal effect on fishery participants. Only implementing regulations promulgated by the Secretary can legally obligate participants. And the Act makes clear that the Secretary retains the sole authority and discretion to determine the contents of any binding fisheries conservation or management regulation. *See* Part II.A.1, *supra.*

## B.    The Magnuson-Stevens Act assigns Regional Fishery Management Councils only an advisory role.

The Magnuson-Stevens Act establishes the Regional Councils as advisory bodies only. The Act provides the Councils with no authority to take any action that has a legal effect or imposes a legal obligation on

any fishery participant. Legal obligations instead flow from the
Secretary's decision to implement a Council's proposal by regulation.
Only regulations promulgated by the Secretary legally bind fishery
participants. Plaintiffs complain that the Act empowers the Councils to
take actions "directly affecting the livelihoods of fishermen and their
communities," (*Bell* Br. at 19–20), but no Council action can do so.

The primary function Congress assigned the Regional Councils is
to "prepare and submit" proposals to the Secretary. *See* 16 U.S.C.
§ 1852(h)(1). As explained above, the Councils prepare and submit
recommended fishery management plans, amendments, and proposed
regulations in a structured process intended to ensure that the
Secretary is aware of state and local equities before establishing federal
fishery policies. But these proposals are just that—proposals. The
Secretary remains free to approve or disapprove of a Council-
recommended plan or amendment and to adopt or alter Council-
proposed implementing regulations. *See* Part II.A, *supra*.

Both textual and structural features of the Magnuson-Stevens Act
confirm the Regional Councils' advisory role. To begin with, Congress
included two express textual indications that it intended the Councils to

perform an advisory function. First, Congress established the Councils to "enable the States, the fishing industry, consumer and environmental organizations, and other interested persons to participate in, and *advise on*, the establishment and administration of" fishery management plans in a manner that "take[s] into account the social and economic needs of the States." 16 U.S.C. § 1801(b)(5) (emphasis added). Second, Congress expressly excluded the Councils from the requirements of the Federal Advisory Committee Act, *id.* § 1852(i)(1), indicating Congress believed the Councils would otherwise be subject to them. This exclusion would be entirely unnecessary and surplusage if Congress thought it was assigning Councils significant authority, rather than advisory functions. "A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous." *Clark v. Rameker*, 573 U.S. 122, 131 (2014) (cleaned up). Plaintiffs ignore these express textual indications of the Councils' advisory function.

The structure of the Magnuson-Stevens Act also makes sense only if the Secretary has ultimate authority over the substance of any fishery management plan, amendment, or implementing regulations. The requirement that Council- proposed plans, amendments, and

regulations undergo notice and comment before the Secretary finalizes them, *see* 16 U.S.C. § 1854(a)(1)(B) & (b)(1)(A), would be pointless if Congress did not understand the Secretary to have discretion to make subsequent decisions informed by the comments received. The limits that Congress placed on judicial review—limiting it to "[r]egulations promulgated by the *Secretary*" and "actions that are taken by the *Secretary* under regulations which implement a fishery management plan," *see id.* § 1855(f)(1)-(2) (emphasis added)—likewise reflect Congress's understanding that only the Secretary, and not the Regional Councils, can take actions that legally bind fishery participants in a manner that might require judicial redress.

Plaintiffs mistakenly assert that the use of the word "authority" in 16 U.S.C. § 1852(a)(1)(E) means that the Gulf Council must have significant federal authority. (*Bell* Br. at 8–9, 25.) But this provision just identifies the waters with respect to which each Regional Council is supposed to make recommendations. It "does not bespeak actual control." *Lofstad v. Raimondo*, 2024 WL 836392, at *21 (D.N.J. Feb. 28, 2024). That the Act assigns the Gulf Council "authority" to make

recommendations for fisheries in federal waters in the Gulf does not constitute assignment of significant federal authority.

With the Councils as advisers, the Secretary remains politically accountable for any legally binding federal fisheries rule. This serves a central aim of the Appointments Clause: "Without a clear and effective chain of command, the public cannot 'determine on whom the blame or the punishment of a pernicious measure … ought really to fall.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 498 (2010) (quoting The Federalist No. 72, at 476 (J. Cooke ed. 1961) (A. Hamilton)). Here, only the Secretary can decide to impose legal obligations on fishery participants, and there is "a clear and effective chain of command" to the Secretary "from the President, on whom all the people vote." *Arthrex*, 594 U.S. at 11. Unlike *Arthrex*, *id.* at 15, there is no diffusion of accountability. On the contrary, all the Act's legal authority is vested in the Presidentially appointed and Senate-confirmed Secretary, who must make an independent decision to promulgate binding implementing regulations and has discretion to revise them as she sees fit. The Secretary thus remains politically accountable for all binding federal fisheries regulations.

### C.  Members of the Gulf Council are not officers of the United States and did not act as officers when proposing the challenged regulations to the Secretary.

The Appointments Clause provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint … all [] Officers of the United States" not otherwise provided for in the Constitution, but that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. Art. 2, § 2, cl. 2. To qualify as an officer, the individual must "occupy a 'continuing' position established by law" and exercise "significant authority pursuant to the laws of the United States." *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 245 (2018) (cleaned up).

Council members do not meet these requirements, and thus are not officers of the United States. Assuming that members of the Regional Councils occupy a "continuing" position despite the temporary and episodic nature of their duties,[12] none of the responsibilities or functions assigned to the Regional Councils in the Magnuson-Stevens

---

[12] The Gulf Council typically meets only a handful of times each year, each meeting lasting about one week. (ROA.2388-92; ROA.2865-69; ROA.3273-77; ROA.3760-64; ROA.4379-83.)

Act requires the exercise of significant federal authority. As discussed above, *see* Part II.B., *supra*, the role of the Council is advisory only. The Council likewise cannot limit, circumscribe, or control the Secretary's ability to regulate fisheries under the Magnuson-Stevens Act. *See* Part II.A., *supra.* Instead, the Secretary retains final say over the contents of any approved fishery management plan or promulgated implementing rule.

For these reasons, many courts have recognized that the Regional Councils play an advisory role inconsistent with exercising significant federal authority. *See, e.g., Lofstad*, 2024 WL 836392, at *21 ("The Council is charged with distilling the members' expertise into recommendations for the Secretary, which the Secretary then independently evaluates to determine whether they comply with her and the President's policy objectives."); *Flaherty*, 373 F. Supp. 3d at 104–10 (recognizing that while the Regional Council is "heavily involved" in the development of plans and implementing regulations, the Council lacks the authority to take final action and so the entire

structure of the Magnuson-Stevens Act "reinforces the advisory nature of the Council's role").[13]

The Executive Branch has likewise long understood the role of the Regional Councils to be wholly advisory and has implemented the Magnuson-Stevens Act accordingly. *See* President Trump Signing Statement on 2018 Amendments to Magnuson-Stevens Act, 2018 WL 6839393 (Dec. 31, 2018) ("Keeping with past practice of the executive branch, my Administration will treat the plans promulgated by the Council *as advisory only*; the adoption of the plans will be subject to the discretion of the Secretary of Commerce as part of the regulatory process described in section 304 of the [Magnuson-Stevens Act].") (emphasis added); President George W. Bush Signing Statement accompanying the 2006 Magnuson-Stevens Reauthorization Act,

---

[13] *See also United Cook Inlet Drift Association v. National Marine Fisheries Serv.*, No. 3:21-CV-00247-JMK, 2022 WL 2222879, at *20 (D. Alaska June 21, 2022) (explaining that, under the Magnuson-Stevens Act, the Regional Councils "are simply advisory bodies and have no legal authority"); *J.H. Miles & Co. v. Brown*, 910 F. Supp. 1138, 1157–59 (E.D. Va. 1995) (finding that the Council has "no 'authority' to do anything[,]" and final decision-making power rests with NMFS); *id.* (concluding that "the Councils appear to be designed to function as advisers, i.e., experts in the field who assist the Secretary in his role in managing the fishery").

2007 U.S.C.C.A.N. S83, 2007 WL 892712 (Jan. 12, 2007) ("The
executive branch shall construe these provisions in a manner consistent
with the Appointments Clause"); President Clinton Signing Statement
accompanying the 1996 Sustainable Fisheries Act, 1996
U.S.C.C.A.N. 4120, 1996 WL 787969 (Oct. 11, 1996).

The actions of the Assistant Administrator and the Council in this
case are consistent with this understanding. Since 2003, Gulf
amberjack stock has been under a Secretarially imposed rebuilding
plan. In April 2021, NMFS notified the Gulf Council that amberjack
remained overfished and would not meet rebuilding targets without
reduced yields, and asked the Council to prepare a proposed plan
amendment and implementing regulations to end overfishing and allow
the stock to rebuild. (ROA.9036.) *See* 16 U.S.C. § 1854(e)(2). In
response, the Council prepared and, in January 2023, submitted to the
Secretary new recommended amberjack catch limits (Amendment 54),
and proposed implementing regulations.

NMFS reviewed the proposed amendment to the fishery
management plan and published notice in the Federal Register seeking
comment from interested persons. *See* 88 Fed. Reg. 13077 (March 2,

2023); 16 U.S.C. § 1854(a)(1). Following review of the proposed regulations, NMFS published a notice of proposed rulemaking seeking comment on them as well. *See* 88 Fed. Reg. 14964 (March 10, 2023); 16 U.S.C. § 1854(b)(1)(A). After considering all public comments received, the Assistant Administrator decided to approve both Amendment 54 and a final rule implementing the revised amberjack catch limits, (ROA.9455), and on June 15, 2023, NMFS promulgated the regulations. Final Rule, 88 Fed. Reg. 39193.

Plaintiffs do not dispute that the Assistant Administrator was properly appointed as an "inferior officer" of the United States or that she was duly authorized to exercise the Secretary's delegated Magnuson-Stevens Act authorities to approve Amendment 54 or promulgate implementing regulations. Instead, Plaintiffs' complaint essentially boils down to the fact that the Assistant Administrator considered, approved, and promulgated an amberjack catch limit proposed by the Council.

But simply recommending a proposal to a duly authorized decisionmaker is not an exercise of significant federal authority. Executive branch decisionmakers routinely consider recommendations

from a variety of sources—federal advisory committees, members of
Congress, judges, State officials, lobbyists, nonprofits, notice-and-
comment participants, concerned citizens—none of whom are officers of
the United States. The Gulf Council members did not require
appointment as an officer to recommend amberjack catch limits, and it
was not constitutionally problematic for the Assistant Administrator to
consider their recommendation.

Because the Council is strictly an advisory body, Council members
are not wielding "significant discretion" or carrying out "important
functions." *Cf. Lucia*, 585 U.S. at 247–48 (citation omitted). As the
Office of Legal Counsel has explained, "an individual who occupies a
purely advisory position … does not hold a position with delegated
sovereign authority of the federal government and therefore does not
hold a federal office." Memorandum Opinion for General Counsels of the
Executive Branch from Steven G. Bradbury, *Officers of the United
States Within the Meaning of the Appointments Clause*,
31 Op. O.L.C. 73, 77 (2007) (Bradbury Memo).

Plaintiffs lead off their argument that the Council nevertheless
has "significant authorities" not with a citation to the Magnuson-

Stevens Act, but with a quotation from an oral interview of a NMFS employee. (*Bell* Br. at 18.) Setting aside that this material is outside the administrative record, it is also entirely beside the point.[14] Appointments Clause challenges turn on the objective legal authorities of the relevant officials, not an individual's subjective views about how bureaucratic processes function, particularly one who does not speak authoritatively for the agency. *See Estes v. U.S. Dep't of the Treasury*, 219 F. Supp. 3d 17, 38 (D.D.C. 2016) (explaining that in Appointments Clause challenge a court need not "evaluate the degree of supervision … authority actually exercised by superiors regarding the particular agency decision at issue, but rather the extent to which relevant statutes or regulations provide for such oversight as a structural matter"); *see also Arthrex*, 594 U.S. at 27.

Plaintiffs also argue that other provisions of the Magnuson-Stevens Act—provisions not implicated by the Secretary's approval of Amendment 54 and promulgation of a Final Rule—give the Council significant authority, and therefore they must be officers of the United

---

[14] This interview should be disregarded. Judicial review is confined to those documents in the administrative record. *See Medina Cnty. Env't. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010).

States. These provisions are not properly before the Court, but regardless, none of them authorizes the Council to take any action legally binding fishery participants.

First, Plaintiffs rely on the final paragraph of 16 U.S.C. § 1854(a)(3), which provides that a "plan or amendment shall take effect as if approved" if the Secretary does not "notify a Council within 30 days of the end of the comment period" of her approval, disapproval, or partial approval. (*Bell* Br. at 27.) Setting aside the fact that the Secretary can easily stop this from happening if she disapproves, this provision does not convey significant authority to the Council for the simple reason that fishery management plans and amendments have no legal effect on fishery participants absent an additional, subsequent decision by the Secretary to promulgate implementing regulations. *See Lofstad*, 2024 WL 836392, at *18 (observing that "even if" a fishery management plan "could take effect without action by the Secretary," it "would not bind any third party").

Fishery management plans "do not themselves have any regulatory effect—implementing regulations must also be enacted in order to effectuate them." *N.C. Fisheries Ass'n*, 550 F.3d at 17. Because

any plan or amendment so "approved" remains entirely precatory, without any direct effect on the legal rights or obligations of fishery participants, the possibility that a Council-recommended plan might be deemed approved does not invest Council members with significant federal authority. Of course, the Secretary can simply prepare and propose an amendment to address any provision of any plan with which she disagrees. And in any event Plaintiffs' argument depends on improperly conflating fishery management plans and amendments— which have no binding legal effect on fishery participants—with implementing regulations that could bind such participants. There is no "deemed approved" provision in the Act concerning implementing regulations. Only the Secretary can promulgate regulations that bind fisheries participants.

Plaintiffs' argument that the Magnuson-Stevens Act's provision on emergency regulations and interim measures to prevent overfishing, *see* 16 U.S.C. § 1855(c)(2), allows the Council to "compel Secretarial action" is also incorrect. (*Bell* Br. at 18–19.) This provision, not implicated here, provides that the Secretary "shall promulgate" emergency regulations or interim measures if a regional council "requests" such measures by a

unanimous vote. *Id.* But the Plaintiffs simply ignore the reality that the Secretary has a representative on the Council subject to her direction—the Regional Administrator, a NMFS employee—and so there could not be a "unanimous" vote without the Secretary's support. Moreover, the Council cannot dictate the terms of any emergency or interim measures to the Secretary, leaving the Secretary with discretion on substance.

Plaintiffs are also wrong that the Council's responsibility to assemble the record that supports its own recommendation constitutes significant federal authority for several reasons. (*Bell* Br. at 29–30.) First, NMFS plays a central role in the development of the record before the Council. NMFS has a representative on the Council, provides technical and administrative support services necessary for the effective functioning of the Council, *see* 16 U.S.C. § 1852(f)(1)–(3), and creates an advisory panel for each plan or amendment, *id.* § 1852(g)(4). Through these roles, NMFS works to ensure that the Council and its staff address important considerations in the Council's record to help inform and support both the Council's recommendation and the agency's subsequent consideration of it.

Second, the materials generated to support the Council's recommendations form only part of the administrative record for any final action by NMFS. The administrative record for NMFS's final actions necessarily extends beyond the Council's recommendations and supporting documentation, as evidenced by the notice-and-comment process every proposed plan, amendment, and implementing regulation undergoes before any final agency action. *See Lofstad*, 2024 WL 836392, at *21 (observing that "Councilmembers here are only one part of the Secretary's information-gathering apparatus in deciding whether to approve and promulgate [a plan] or regulation").

Plaintiffs' argument about the Council's role in developing the record also ignores important differences between agency adjudication and rule-making contexts. Plaintiffs rely on inapposite case law that involves creating a factual record for a decision in an adjudicative proceeding. (*Bell* Br. at 29 (citing *Freytag*, 501 U.S. 868 (special tax judges); *Lucia*, 585 U.S. 237 (Securities & Exchange Commission administrative law judges), and *Burgess v. Fed. Deposit Ins. Corp.*, 871 F.3d 297 (5th Cir. 2017) (Federal Deposit Insurance Corp. administrative law judges)).) Courts considering Appointments Clause

cases in the adjudication context have emphasized the ability of an administrative law judge or similar official to shape the factual record for any subsequent legal decision by managing discovery, deciding on whether and when to compel the production of evidence, taking testimony, and similar decisions that drive adjudicative fact-finding.

But even if such actions could improperly constrain a final decisionmaker in an agency adjudication, those concerns do not translate to the rule-making context. Here, the Council's decisions about what to place in the record for *the Council's* recommendation do not limit what NMFS may consider in *NMFS's* rule-making decision. Rather, NMFS is free to add to the administrative record, and weigh, any information or consideration that arises from within the agency or through the notice-and-comment process even if it were not included in the Council's record. The Council's ability to prepare the record supporting its own recommendations does not constitute significant authority. These provisions and others[15] thus do not give the Regional Councils the ability to exercise any significant authority.

---

[15] Plaintiffs similarly misread 16 U.S.C. § 1854(h) to limit the Secretary. (*Bell* Br. at 30–31.) Instead, this provision functions as a limit on the Council by requiring the Council, if it wishes to repeal or revoke a

The inability of Regional Councils to take actions that impose legally enforceable obligations on fishery participants stands in sharp contrast to those cases finding that officials exercise significant authority for Appointments Clause purposes. For example, the administrative law judges in *Lucia* "exercise[d] significant discretion" in

---

fishery management plan, to recommend doing so by a three-quarters majority, instead of the simple majority otherwise needed for Council decisions, *id.* § 1852(e)(1), and is intended to ensure a level of stability in Council recommendations as membership changes. The Secretary retains authority to amend a plan as necessary in her judgment if the Council fails to recommend an appropriate amendment in a reasonable timeframe. *Id.* § 1854(c). The Secretary also retains ultimate discretion on whether to repeal or revoke a plan. *Id.* § 1854(h).

Section 1854(c)(3) also does not give the Council significant authority. Plaintiffs mistakenly assert that "Councils alone decide whether to impose 'limited access system[s]' on fisheries." (*Arnesen* Br. at 23.) (A "limited access system" is "a system that limits participation in a fishery to those satisfying certain eligibility criteria or requirements contained in a fishery management plan or associated regulation" and may include "limited access privileges" such as "an individual fishing quota." *Id.* § 1802(26), (27).) But Councils have no authority to *impose* limited access systems; only the Secretary can approve a plan including a limited access system and implement it by rule. The Council's concurrence merely ripens the issue for the Secretary's ultimate decision. *Cf. Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wis. v. United States*, 259 F. Supp. 2d 783, 796 (W.D. Wis. 2003) (gubernatorial concurrence provision in Indian Gaming Regulatory Act does not violate Appointments Clause because governor exercises no "significant authority" where governor cannot require Secretary of the Interior to take land for gaming purposes), *aff'd*, 367 F.3d 650 (7th Cir. 2004).

"tak[ing] testimony, conduct[ing] trials, rul[ing] on the admissibility of evidence, and . . . enforc[ing] compliance with discovery orders." 585 U.S. at 247 (cleaned up). The Court found that they were officers because they exercised "nearly all the tools of federal trial judges" and issued opinions that could be "deemed the action of the Commission" resolving a legal matter without further review. *Id.* at 249. The Court relied on similar considerations in *Freytag* to find that Tax Court special trial judges—who "take testimony, conduct trials, … and … enforce compliance with discovery orders" and who had the power to "punish contempts by fine or imprisonment"—were inferior officers. 501 U.S. at 881–82, 891.

And in *Buckley v. Valeo*, the Supreme Court found that Federal Election Commission members had "primary and substantial responsibility for administering and enforcing the [Federal Election Campaign] Act," including record-keeping, disclosure, investigative functions, and extensive rule making and adjudicative powers, and so were officers under the Appointments Clause. 424 U.S. 1, 109 (1976). The Court considered that the members had "primary responsibility for

conducting civil litigation in the courts of the United States" and "broad

administrative powers" of "rulemaking." *Id.* at 140.

Council members have no comparable powers to take binding legal

actions, conclusively shape the record, or engage in their own

rulemaking or adjudication. Council members thus do not exercise

significant authority and are not officers of the United States.[16]

---

[16] Plaintiffs argue that the members of the Council should be viewed as principal rather than inferior officers. (*Bell* Br. at 32–42; *Arnesen* Br. at 21–25.) The Court need not reach this question because Council members do not exercise significant federal authority at all. But even if the Court were to conclude that Council members exercise significant authority in some circumstances, they would do so only as inferior officers subject to the Secretary's supervision.

"Whether one is an 'inferior' officer depends on whether he has a superior" other than the President. *Arthrex*, 594 U.S. at 13 (quoting *Edmond v. United States*, 520 U.S. 651, 662 (1997)).  An inferior officer must be "directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Id.* Here, as in *Edmond*, the Council members are supervised by the Secretary (a principal officer) and can take no action that legally binds fishery participants absent separate, and affirmative action by the Secretary. Because any action by the Council must be mediated—and approved—by the Secretary before it can have any binding effect on any fishery participant, the statute provides no support for Plaintiffs' contention that Council members are principal officers.

D.     **The Court must construe any ambiguity in the Magnuson-Stevens Act to avoid constitutional doubt.**

The plain text and structure of the Magnuson-Stevens Act is thus properly read not to assign any significant authority to the Regional Councils. But even if the Court were to find some ambiguity about whether any particular provision of the Act might afford the Council members significant authority that they are not authorized to exercise because of their appointment, constitutional avoidance requires reading such provisions to assign the Council an advisory role.

Plaintiffs advocate for this Court to hold that the Magnuson-Stevens Act's longstanding Regional Council structure violates the Appointments Clause based on inferences and extrapolation they claim create limits on the Secretary's discretion and confer significant authority on the Councils. But this approach contradicts the Court's duty to construe statutes to avoid constitutional doubt. The Court should find the Act to authorize unconstitutional Council actions only if the Act unambiguously does so.

So long as there is a reading of the Act that is "fairly possible" and consistent with the Constitution, "the canon of constitutional avoidance would still counsel [the court] to adopt it." *See Hansen*, 599 U.S. at 781

73

(quoting *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018)). Here, it is at least "fairly possible" to read the Act to convey only advisory responsibilities to the Regional Councils. Any ambiguity in this regard should be construed to avoid, rather than create, constitutional doubts. The Court should "seek harmony" rather than take up Plaintiffs' invitation "to manufacture conflict," *Hansen*, 599 U.S. at 781, and confirm the Councils' advisory role.

## III.    Plaintiffs are not entitled to relief against the amberjack catch limits established by the Final Rule.

The Assistant Administrator's decision to accept the Gulf Council's recommendation and promulgate the Final Rule was not constitutionally problematic under the Appointments Clause. *See* Part II, *supra.* But if the Court were to disagree and conclude that the Council members unconstitutionally exercised significant authority without proper appointment, the Court must evaluate what relief is appropriate. That analysis should begin with determining which parts of the Magnuson-Stevens Act are displaced by the Constitution. Only then, after determining which portions of the Act are severed as repugnant to the Constitution, should the Court consider what, if any, other relief would be appropriate. Here, that analysis makes clear that vacatur of the Final Rule is not warranted.

A.   **If the Regional Council's recommendations improperly constrict the Secretary's discretion, statutory restrictions on Secretarial discretion should be severed to the extent necessary under the Constitution.**

The Secretary retains authority to disapprove Council recommendations and to revise proposed regulations before promulgating final rules. *See* Part II.A., *supra*. But if the Court were to conclude that—notwithstanding those authorities—the Magnuson-Stevens Act nevertheless permits the Council to constrain the Secretary's discretion when approving fishery management plans and amendments or promulgating final implementing regulations in a manner that constitutes significant authority, then the proper response is severance. Whichever aspects of section 1854 that the Court were to conclude allow the Council to bind the Secretary's discretion to disapprove or revise Council proposals should be severed to the extent required by the Constitution and the Court should remand to the Secretary to reevaluate the Final Rule freed from those constraints. This approach would cure any Appointments Clause concern and confirm that fishery decisions are subject to a chain of command from the President to the Secretary.

"When confronting a constitutional flaw in a statute," the Court's task is to "try to limit the solution to the problem" by disregarding the "problematic portions while leaving the remainder intact." *Ayotte*, 546 U.S. at 328–29; *accord Arthrex*, 594 U.S. at 23. The advisory functions of the Regional Councils and the structured process that ensures the Secretary takes state and local equities into account before setting federal fisheries conservation and management policy sit at the core of Congress's approach to fisheries management in the Act. *See* 16 U.S.C. §§ 1801(b)(5), 1851–1855. These core aspects of the Councils' role fully comply with Appointments Clause requirements and are central to Congress's effort to ensure sustainable fishery practices.

Plaintiffs argue that the Magnuson-Stevens Act unconstitutionally empowered the Gulf Council to constrain the Assistant Administrator's consideration of Amendment 54 and proposed implementing regulations. This misconstrues the nature of the Secretary's review provided in sections 1854(a)(1)(A) and 1854(b)(1), *see* Part II.A., *supra.* But if the Court were to agree that these provisions unconstitutionally constrained the Secretary's review, the Constitution displaces those provisions, and the Court should sever them to the

extent the Constitution requires.[17] If aspects of the Act improperly allow Council members to exceed their advisory role and take on authority reserved for officers of the United States, those provisions should be truncated. The Final Rule could be remanded to the Secretary to reconsider given those developments.

The Supreme Court took a substantively similar approach to severance to eliminate an Appointments Clause violation in *Arthrex*. *Arthrex* addressed the officer status of judges serving on the Patent Trial and Appeal Board, an adjudicative body within the U.S. Patent and Trademark Office. The Court held that the patent judges exercised powers "incompatible with their appointment by the Secretary to an inferior office." 594 U.S. at 23. That incompatibility arose from statutory prohibitions on the relevant principal officer unilaterally

---

[17] For instance, the Court might make clear that the terms of the Secretary's review under sections 1854(a)(1)(A) and 1854(b)(1) do not limit the Secretary's discretion to consider other lawful factors, and that the Secretary therefore retains full discretion to decide whether to approve or disapprove any plan or amendment and to revise and proposed implementing regulations before promulgating a final rule. Severing these provisions to the extent the Court concludes that they constrain the decisions of the Secretary or her delegee would be consistent with the Executive Branch's longstanding interpretation and implementation of the Magnuson-Stevens Act.

reviewing patent judge decisions, *see* 35 U.S.C. § 6(c), and prohibitions on removing those judges at will, *see* 5 U.S.C. § 7513. Together, these provisions problematically "restrain[ed]" the principal officer from reviewing adjudicative decisions, which broke the "chain of command" between the Director and his subordinates. *Arthrex*, 594 U.S. at 15, 27. The Court concluded that this Appointments Clause violation could be eliminated by "a tailored approach," explaining that if the principal officer "were to have the 'authority to take control' of" the adjudicative proceedings, then the patent judges "would properly function as inferior officers." *Id.* at 25. The Court thus severed 35 U.S.C. § 6(c) "to the extent that its requirements prevent the [principal officer] from reviewing final decisions rendered by" the patent judges. *Ibid.*

A comparable "tailored approach" here would sever the Magnuson-Stevens Act's provisions to the extent that they provide the Regional Councils with authority incompatible with their method of appointment, thereby making clear that the Councils play an advisory role. Severing any constraints on the Secretary's review of Council proposals found to be unconstitutional would mirror how the Supreme Court severed the limitations in 35 U.S.C. § 6(c), thereby permitting the

principal officer in *Arthrex* to review and reject decisions by patent judges. And this approach—effectively severing provisions inconsistent with the Regional Councils' advisory role—would also follow a remedial approach the Supreme Court contemplated in other cases. In *Free Enterprise Fund*, for example, the Court held that "the language providing for good-cause removal" of members of the Public Company Accounting Oversight Board was "only one of a number of statutory provisions that, working together, produce[d] a constitutional violation." 561 U.S. at 509. "In theory," the Court explained, it might address the separation-of-powers violations by invalidating "a sufficient number of the Board's responsibilities so that its members would no longer be 'Officers of the United States.'" *Ibid.* Or, the Court suggested, it might restrict the Board's powers "so that it would be *a purely recommendatory panel.*" *Ibid.* (emphasis added). Adopting such an approach here would be the narrowest possible modification to the scheme Congress created in the Magnuson-Stevens Act and would cure any constitutional violation.

Plaintiffs argue instead that, if a single provision authorizes the Regional Councils to take some action that qualifies as significant

authority, the Court should find that large swathes of the Magnuson-Stevens Act are effectively inoperative. Plaintiffs contend that federal fisheries should no longer be subject to Council-recommended fishery conservation and management measures, even if approved and promulgated through final implementing regulations by the Secretary's duly authorized delegee. But this blunderbuss approach—calling fifty years of Secretarial actions regulating fisheries based on Council recommendations into question and leaving federal fisheries potentially unregulated to overfishing—cannot be reconciled with the Court's obligation to sever the "problematic portions while leaving the remainder intact." *Arthrex,* 594 U.S. at 23. "Constitutional litigation is not a game of gotcha against Congress, where litigants can ride a discrete flaw in a statute to take down the whole, otherwise constitutional statute." *Barr v. American Ass'n of Political Consultants,* 140 S. Ct. 2335, 2351 (2020) (plurality opinion).

Given Congress's purpose in enacting the Act— to prevent overfishing and provide for sound conservation and management of federal fisheries consistent with the National Standards in a manner that takes state and local voices into account before decisions are

made—there is no reason to doubt that Congress would prefer an Act where the Secretary regulated federal fisheries in accordance with the National Standards based on the advice of Regional Councils to one where the Secretary was disempowered from using the Councils at all, and instead used her authorities under sections 1854(c) and 1855(d) to regulate fisheries without any state or local input. *Cf. Free Enterprise Fund*, 561 U.S. at 509 ("Nothing in the statute's text or historical context made it evident that Congress, faced with the limitations imposed by the Constitution, would have preferred no Board at all to a Board whose members are removable at will.") (cleaned up).

Such an approach follows from the "normal rule" that "partial" rather than wholesale "invalidation is the required course," so as not to "nullify more of a legislature's work than is necessary." *Ayotte*, 546 U.S. at 329 (cleaned up). If the "remainder of the statute is 'capable of functioning independently' and thus would be 'fully operative' as a law," "[t]he Court's precedents reflect a decisive preference for surgical severance rather than wholesale destruction." *American Assoc. of Pol. Consultants,* 140 S. Ct. at 2350–52 (plurality opinion) (citation omitted).

This limited approach to severance would preserve the Magnuson-Stevens Act as independently functioning, fully operative law.

Plaintiffs also argue that other provisions of the Magnuson-Stevens Act not at issue in the process that led to Amendment 54 and the Final Rule demonstrate that Council members can exercise significant authority.[18] These arguments are mistaken, *see* Part II.C., *supra*, and in any event full consideration of any remedy related to these provisions should be reserved for an appropriate case in which their operation is actually at issue. But if the Court views these provisions differently, they too should be severed to the extent necessary under the Constitution to preserve the Regional Councils' core advisory function under the Act.

## B. Any injury to Plaintiffs is caused by the Secretary's independent decision to promulgate the Final Rule, not any constitutional infirmity in the Regional Council.

Even if Plaintiffs were correct that there is constitutional infirmity in the appointment of Gulf Council members, Plaintiffs also

---

[18] Plaintiffs rely on 16 U.S.C. §§ 1854(a)(3) ("as-if approved" paragraph), 1854(c)(3), 1855(c)(2), and 1854(h), (*Bell* Br. at 18–31; *Arnesen* Br. at 21–25), but none of these provisions were implicated in the process leading to the challenged Final Rule.

have still failed to show that such infirmity is the cause of any injury they suffer. Instead, any injury to Plaintiffs flows from the Final Rule duly promulgated by the Assistant Administrator based on her independent judgment. Plaintiffs offer no dispute that the Assistant Administrator is a duly appointed inferior officer of the United States authorized to exercise the Secretary's delegated authorities under the Magnuson-Stevens Act. Nor do they identify any substantive infirmity in the Final Rule itself or contend that the Secretary might have taken a different approach. Because the Assistant Administrator could impose the amberjack catch limit and lawfully did so, Plaintiffs cannot show that any purported problems at the Council level caused any injury.

For the reasons explained in Part II, *supra*, there was no infirmity in the Gulf Council's recommendation of Amendment 54 and its proposed implementing regulations. But if this Court concludes that those proposals were invalid, the Magnuson-Stevens Act would nonetheless have obligated the Assistant Administrator, fulfilling the Secretary's responsibilities, to take action to address overfishing and facilitate rebuilding of the amberjack stock. Congress amended the Act in 2007 to require *all* fishery management plans developed in overfished

fisheries "to end overfishing *immediately*," Pub. L. No. 109-479, Tit. I,
§ 104, 120 Stat. 3579, 3584 (emphasis added) (amending 16 U.S.C.
§ 1854(e) "by inserting 'immediately' after 'overfishing' in
paragraph (3)(A)"), and it prescribed a process for identifying these
fisheries and rebuilding their stocks, *see* 16 U.S.C. § 1854(e)(2)–(4).

Following this process, NMFS provided the Gulf Council notice in
April 2021 of continued overfishing of the amberjack stock. *Id.*
§ 1854(e)(2). (*See* ROA.9036.) Had the Council not prepared
recommendations to address overfishing and rebuild the amberjack
stock within two years of this notice, the Act would have required the
Secretary to prepare her own plan amendment to do so. *See* 16 U.S.C.
§ 1854(e)(5). Thus, if the Court were to treat the Council's proposal of
Amendment 54 as void *ab initio*, then in April 2023 (with no valid
Council proposal), the Assistant Administrator would nevertheless have
had both authority and an obligation to implement revised amberjack
limits on her own. Whether through a Council or Secretarial plan,
Plaintiffs would have faced substantial catch-limit restrictions.

By reaching an independent decision to approve Amendment 54
and promulgate the Final Rule, then, the Assistant Administrator has

broken any causal connection between the Council's action and injury to Plaintiffs, as the district court recognized. She likewise has already effectively ratified the Gulf Council's recommendations and accepted them as her own decision. That ratification remedies any Appointments Clause violation. "Ratification occurs when a principal sanctions the prior actions of its purported agent," *Moose Jooce v. FDA*, 981 F.3d 26, 28 (D.C. Cir. 2020) (cleaned up), and in doing so "adopts" those actions "as [her] own," *Williams v. Thrasher*, 62 F.2d 944, 946 (5th Cir. 1933).

Ratification furthers the underlying purpose of the Appointments Clause, which is "designed to preserve political accountability," *Edmond*, 520 U.S. at 663, by ensuring that "the Secretary of [Commerce], a politically accountable official," *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 563 (2005), is subject to blame or praise for those ratified decisions. *Accord Freytag*, 501 U.S. at 884 (the Appointments Clause "ensure[s] that those who wield[]" appointment authority are "accountable to political force and the will of the people"). Ratification of an allegedly improper official's prior action resolves an Appointments Clause claim on the merits by remedying the defect (if any) from the initial appointment. *See Guedes v. Bureau of Alcohol,*

*Tobacco, Firearms & Explosives*, 920 F.3d 1, 13 (D.C. Cir. 2019);

*Kajmowicz v. Whitaker*, 42 F.4th 138, 147–48 (3d Cir. 2022).

The *Arnesen* Plaintiffs' bald assertion that "[t]he Secretary lacked any statutory authority to promulgate Amendment 54 before the Council developed it," (*Arnesen* Br. at 49 n.13), is mistaken. To begin with, the Secretary always has authority to prepare her own fishery management plan or amendment and implement it by regulation where a fishery "requires conservation and management" and the appropriate Council "fails to develop and submit" a plan or amendment in "a reasonable period of time," 16 U.S.C. § 1854(c)(1)(A), (c)(6). And given the status of the amberjack stock here—overfished and in need of a revised rebuilding plan—Congress has further obligated the Secretary to act if the Council has not made a valid recommendation to address those issues. Had the Council failed to recommend additional measures to prevent overfishing and allow the amberjack stock to rebuild (or if their recommendations are void), the Act not only authorizes but compels the Secretary to prepare her own plan amendment and implementing regulations to do so. *See id.* § 1854(e)(5).

### C. Plaintiffs cannot show injury caused by any constitutional infirmity in the Regional Council because a duly appointed quorum of the Gulf Council recommended the amberjack catch limits.

Alternatively, Plaintiffs have also failed to establish that any alleged constitutional infirmity in the Regional Council has caused them injury because, regardless, the majority of a duly appointed quorum of the Gulf Council recommended the challenged amberjack catch limits. Even if the Court were to conclude that the Regional Councils exercise significant federal authorities and therefore members of the Councils must be properly appointed as officers of the United States, Plaintiffs have not shown any resulting harm on the facts here.

Eleven of the Gulf Council's members were appointed by the Secretary. 16 U.S.C. § 1852(a)(1)(E), (b)(2)(C). (ROA.9921-43; ROA.9955-65 (Council members appointments and commissions).) Because Congress provided in the Magnuson-Stevens Act for appointment of these members by the Secretary—a "Head[] of Department[]," U.S. Const. Art. 2, § 2, cl. 2—their appointments meet the requirements of the Appointments Clause for inferior officers.[19]

---

[19] Council members would not be principal officers. *See* note 16, *supra*. The Court should disregard Plaintiffs' suggestion that the Council's

These eleven members constitute a quorum of the Gulf Council, 16 U.S.C. § 1852(e)(1), and voted 10-1 in favor of recommending Amendment 54 and proposed implementing regulations. (ROA.4721-23.)

Plaintiffs contend that Council members appointed by the Secretary cannot be duly appointed inferior officers because the Magnuson-Stevens Act assigns state governors a role recommending candidates for any vacancy. (*Bell* Br. at 43–52; *Arnesen* Br. at 25–35.) But the gubernatorial role in identifying qualified candidates knowledgeable about state and local concerns does not make the Secretary's appointments invalid for Appointments Clause purposes. The mere fact that someone other than the appointing official plays some role in identifying candidates for potential appointment, alone, is not constitutionally problematic. *See Myers v. United States*, 272 U.S. 52, 274 & n.56 (1926) (Brandeis, J., dissenting) (identifying examples where Congress "confined the President's selection to a small

---

supervision by the Assistant Administrator, exercising the Secretary's delegated authorities, is somehow problematic because she is not a principal officer. (*Bell* Br. at 34, 42.) Plaintiffs are simply wrong that every inferior officer must be supervised directly—rather than "at some level," *Arthrex*, 594 U.S. at 13—by a principal officer.

number of persons to be named by others");[20] *Power of the Secretary of the Treasury to Remove Inspectors of Hulls and Boilers*, 10 Op. Att'y Gen. 204, 205–07 (1862) (finding constitutional initial selection of officer nominee by a board that included, among others, a district court judge). Rather, the Supreme Court has historically recognized that the chief constitutional limit for statutory qualifications on officeholding is that they may "not so limit selection and so trench upon executive choice as to be in effect legislative designation." *Myers*, 272 U.S. at 128.

The Secretary's substantial freedom to choose from qualified candidates demonstrates that this is not the case here. The Act gives the Secretary authority to determine the appropriate qualifications that govern any candidate offered by a governor, 16 U.S.C. § 1852(b)(2)(A), and she has done so by regulation, 50 C.F.R. § 600.215(b)(1). The terms of the Act provide for state governors to offer the Secretary a reasonable range of candidates to select from for any vacancy. Contrary to Plaintiffs' claims, (*Bell* Br. at 50), the Act does not provide for only three

---

[20] Plaintiffs assert that this list involved "obvious non-officer positions," (*Arnesen* Br. at 29–30), but even just a cursory inspection shows this is incorrect. *See, e.g.*, Act of Feb. 25, 1863, ch. 58, § 1, 12 Stat. 665, 665 (comptroller of the currency "charged with the execution of" federal laws "respecting the issue and regulation of a national currency").

candidates per vacancy, but instead provides for three or more candidates from *each* constituent state for a given Regional Council. 16 U.S.C. § 1852(b)(2)(C). That is five States, or fifteen or more candidates, for vacancies on the Gulf Council here. *Id.* § 1852(a)(1)(E). The Act requires that at least one of the Secretarial appointees be appointed from each of the constituent States, *id.*, but the Act affords the Secretary a number of opportunities to meet this requirement across eleven possible vacancies.[21] And in the end, if the Secretary is not satisfied with the canidates offered, she does not have to make an appointment at all; instead, she can continue to return the lists to the governors and withhold appointment until she is satisfied with a candidate.

Plaintiffs also argue that, even if the Secretarial appointees are properly appointed inferior officers, the participation of others in the

---

[21] NMFS, by regulation, has determined to treat five vacancies on the Gulf Council as state-obligated seats where the Secretary will only consider candidates proposed by the governor of that State. *See* 50 C.F.R. § 600.215(a)(2)(i). The remaining six seats are "at large" and can be filled by candidates from any constituent state. *Id.* § 600.215(a)(2)(iii). But a decision by the Executive Branch to restrict, voluntarily, the candidates it will consider for a position, unlike a mandatory limitation imposed by Congress, does not raise an Appointments Clause issue.

deliberations leading to the recommendations means that the resulting recommendations are structurally flawed, citing *Fed. Election Commission v. NRA Pol. Victory Fund*, 6 F.3d 821 (D.C. Cir. 1993), and *Nguyen v. United States*, 539 U.S. 69 (2003). (*Arnesen* Br. at 37–38; *Bell* Br. 57–65.) But none of the cases cited by Plaintiffs involve an Appointments Clause challenge where a quorum of a multi-member entity was duly appointed and endorsed the challenged action. *Nguyen* is not even a constitutional case, but rather involved a question of statutory interpretation. 539 U.S. at 74–75 (applying 28 U.S.C. § 292(a)); *id.* at 82–83 (construing 28 U.S.C. § 46(b)). And whatever persuasive authority *NRA Political Victory Fund* has, it involved unique separation-of-powers issues where congressional agents participated in Executive Branch deliberations. 6 F.3d at 826–27 (discussing separation-of-powers concerns). The Appointments Clause cases Plaintiffs rely on all involve individual officials making decisions or undertaking adjudications, where an improperly appointed official would have necessarily played a role in any injury to plaintiffs.

That is not so here, where most of a quorum of properly appointed Council members voted to recommend Amendment 54 and proposed

implementing regulations. Of course, if Regional Council members exercise significant authority at all, they do so only by voting for measures before the Council. But here, even if the votes of the non-Secretarially appointed members were treated as invalid and therefore void *ab initio*, there would be no reason to invalidate the votes of the eleven members appointed by the Secretary, and those votes alone would still have the same effect of endorsing the recommendation of Amendment 54 and associated implementing regulations. Invalidating the remaining members' votes would not affect the outcome.[22]

---

[22] Because the majority of a duly appointed quorum of the Gulf Council voted to recommend Amendment 54 and the proposed implementing regulations, the Court need not reach the status of the remaining Council members. At any rate, the fact that some members serve because of their state office does not automatically offend the Appointments Clause. State officials are routinely authorized to participate in the administration of federal laws without transforming their office from a state office to an office of the United States. *See generally* Bradbury Memo, 31 Op. O.L.C. at 99–100 (explaining that the Appointments Clause "ordinarily does not apply to" state officers). Indeed, the Framers assumed that state officials would be empowered to exercise federal authority. *See, e.g.*, The Federalist No. 45, at 313 (Madison, J.) (predicting "the eventual collection [of internal revenue] under the immediate authority of the Union" by state officials and finding it likely that "the officers of the States will be cloathed with the correspondent authority of the Union" in other instances). As the Office of Legal Counsel has explained, "Where state officials do exercise significant authority under or with respect to federal law, they do so *as state officials*." 31 Op. O.L.C. at 100 (emphasis original).

### D.     The *Arnesen* Plaintiffs' removal claims are not relevant here.

Because the members of the Council are not officers of the United States and do not exercise significant federal authority, *see* Part II.C., *supra*, the conditions under which they might be removed have no bearing on the lawfulness of the recommendations and advice they provide to the Secretary. There is no requirement that the Secretary weigh advice only from persons subject to at-will removal. The Secretary can simply disregard the advice rather than remove the official.

In any case, under controlling Fifth Circuit precedent, Plaintiffs have failed to state a cognizable removal claim. Even if the Council members were officers and the removal restrictions presented

---

Nor does the Regional Administrator's presence on the Council pose a problem. The current Regional Administrator, Andy Strelcheck, was not appointed by the Secretary and so does not qualify as an inferior officer, although, as a NMFS employee, he is subject to direction by the Secretary and Assistant Administrator in the performance of his role on the Gulf Council. However, if this Court determines that he should have been so appointed, then the proper remedy is to remand to the Secretary. Although it has not happened here, the Secretary has statutory authority pursuant to the Department's organic acts to appoint the Regional Administrators as an officer. *See, e.g.*, *United States v. Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d 598, 618–23 (D.D.C. 2018).

constitutional concerns, the critical question remains whether Plaintiffs would be entitled to any relief on their removal challenge. Without allegations or evidence of "compensable harm" or prejudice caused *by the removal restriction* specifically in connection with the challenged action, there is no basis to invalidate Amendment 54 or the Final Rule.

While the *Arnesen* Plaintiffs try to frame the question as whether a constitutionally problematic removal restriction is severable, (*see Arnesen* Br. at 52–58), this Court (and the Supreme Court) have made clear that the question instead is one of causation: "Plaintiffs must demonstrate that the unconstitutional removal provision *caused them harm.*" *Comm. Fin. Servs. Ass'n*, 51 F.4th at 631–33 (emphasis added); *see also Collins v. Yellen*, 141 S. Ct. 1761, 1788–89 (2021) (To obtain a remedy, the challenging party must demonstrate not only that the removal restriction violates the Constitution but also that "the unconstitutional removal provision inflicted harm."). This Court has identified "three requisites for proving harm: (1) a substantiated desire by the President to remove the unconstitutionally insulated actor, (2) a perceived inability to remove the actor due to the infirm provision, and (3) a nexus between the desire to remove and the challenged actions

taken by the insulated actor." *Comm. Fin. Servs. Ass'n*, 51 F.4th at 632;

*see also K&R Contractors, LLC v. Keene*, 86 F.4th 135, 149 (4th

Cir. 2023) (collecting cases and holding that "K & R has not asserted

any possible harm resulting from the allegedly unconstitutional

limitations" and "[t]herefore K & R is not entitled to" relief "regardless

of whether the removal protections … are constitutional"). The *Arnesen*

Plaintiffs here have failed to make this required showing of harm.[23]

---

[23] Federal Defendants have not argued that the Regional Administrator, a career member of the Senior Executive Service, was properly appointed as an inferior officer of the United States. This case therefore does not present the issue of whether any restrictions on his removal are constitutionally problematic. (*Cf. Arnesen* Br. at 62–68.) Instead, the only question relating to the Regional Administrator is whether he improperly acted as an officer of the United States and, if so, whether Plaintiffs suffered injury traceable to such actions. Federal Defendants nonetheless note Plaintiffs' characterization of the Regional Administrator as unconstitutionally insulated from removal is inaccurate. While there are some limitations on removing Senior Executive Service officials from federal service entirely, the Secretary generally has discretion to reassign such officials within the agency— and thus can remove the Regional Administrator from his position and install someone else in that position and the Council seat. 5 U.S.C. § 3395. And, ultimately, Senior Executive Service employees can be removed from the Service for anything less than "fully successful executive performance," 5 U.S.C. § 3592, a capacious standard that would not impose constitutionally problematic limitations for inferior officers.

## CONCLUSION

This Court should affirm the district court's summary judgment for

Federal Defendants.

Respectfully submitted,

s/ *John E. Bies*
TODD KIM
*Assistant Attorney General*

RACHEL HERON
ARIELLE MOURRAIN
    JEFFRIES
JOHN E. BIES
*Attorneys*
Environment and Natural
    Resources Div.
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-3785
john.bies@usdoj.gov

April 30, 2024
90-8-8-08610
90-8-8-08643

## CERTIFICATE OF COMPLIANCE

I hereby certify:

1.     This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i), as enlarged by the Court's Order of April 18, 2024, because, excluding the parts of the document exempted by Rule 32(f), this document contains 17,983 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century font.

s/ *John E. Bies*
JOHN E. BIES

Counsel for Federal Defendants

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1)     all required privacy redactions have been made per 5th Cir. R. 25.2.13;

(2)     the electronic submission is an exact copy of the paper document, 5th Cir. R. 25.2.1; and

(3)     the document has been scanned for viruses with the most recent version of a commercial virus scanning program, Windows Defender Antivirus Version 1.409.612.0 (updated Apr. 30, 2024), and according to the program is free of viruses.

s/ *John E. Bies*
JOHN E. BIES

Counsel for Federal Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2024, I electronically filed the foregoing using the court's CM/ECF system, which will notify all registered counsel.

s/ *John E. Bies*

JOHN E. BIES

Counsel for Federal Defendants

# ADDENDUM

The Appointments Clause,
U.S. Const. Art. 2, § 2, cl. 2 ........................................................... 2a

The Magnuson-Stevens Act,
16 U.S.C. § 1801 ............................................................................ 3a

16 U.S.C. § 1851 ............................................................................ 8a

16 U.S.C. § 1852 (excerpts) ........................................................ 10a

16 U.S.C. § 1853 .......................................................................... 29a

16 U.S.C. § 1854 (excerpts) ........................................................ 38a

16 U.S.C. § 1855 (excerpts) ........................................................ 47a

Constitution of the United States

Article II. The President

Const. Art. II § 2, cl. 2

### Section 2, Clause 2. Treaty Making Power; Appointing Power

He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

United States Code

Title 16. Conservation

Chapter 38. Fishery Conservation and Management

Subchapter I. Generally

16 U.S.C. § 1801

### § 1801. Findings, purposes and policy

(a) Findings

The Congress finds and declares the following:

(1) The fish off the coasts of the United States, the highly migratory species of the high seas, the species which dwell on or in the Continental Shelf appertaining to the United States, and the anadromous species which spawn in United States rivers or estuaries, constitute valuable and renewable natural resources. These fishery resources contribute to the food supply, economy, and health of the Nation and provide recreational opportunities.

(2) Certain stocks of fish have declined to the point where their survival is threatened, and other stocks of fish have been so substantially reduced in number that they could become similarly threatened as a consequence of (A) increased fishing pressure, (B) the inadequacy of fishery resource conservation and management practices and controls, or (C) direct and indirect habitat losses which have resulted in a diminished capacity to support existing fishing levels.

(3) Commercial and recreational fishing constitutes a major source of employment and contributes significantly to the economy of the Nation. Many coastal areas are dependent upon fishing and related activities, and their economies have been badly damaged by the overfishing of fishery resources at an ever-increasing rate over the past decade. The activities of massive foreign fishing fleets in waters adjacent to such coastal areas have contributed to such damage,

interfered with domestic fishing efforts, and caused destruction of the fishing gear of United States fishermen.

(4) International fishery agreements have not been effective in preventing or terminating the overfishing of these valuable fishery resources. There is danger that irreversible effects from overfishing will take place before an effective international agreement on fishery management jurisdiction can be negotiated, signed, ratified, and implemented.

(5) Fishery resources are finite but renewable. If placed under sound management before overfishing has caused irreversible effects, the fisheries can be conserved and maintained so as to provide optimum yields on a continuing basis.

(6) A national program for the conservation and management of the fishery resources of the United States is necessary to prevent overfishing, to rebuild overfished stocks, to insure conservation, to facilitate long-term protection of essential fish habitats, and to realize the full potential of the Nation's fishery resources.

(7) A national program for the development of fisheries which are underutilized or not utilized by the United States fishing industry, including bottom fish off Alaska, is necessary to assure that our citizens benefit from the employment, food supply, and revenue which could be generated thereby.

(8) The collection of reliable data is essential to the effective conservation, management, and scientific understanding of the fishery resources of the United States.

(9) One of the greatest long-term threats to the viability of commercial and recreational fisheries is the continuing loss of marine, estuarine, and other aquatic habitats. Habitat considerations should receive increased attention for the conservation and management of fishery resources of the United States.

(10) Pacific Insular Areas contain unique historical, cultural, legal, political, and geographical circumstances which make fisheries resources important in sustaining their economic growth.

(11) A number of the Fishery Management Councils have demonstrated significant progress in integrating ecosystem considerations in fisheries management using the existing authorities provided under this chapter.

(12) International cooperation is necessary to address illegal, unreported, and unregulated fishing and other fishing practices which may harm the sustainability of living marine resources and disadvantage the United States fishing industry.

(13) While both provide significant cultural and economic benefits to the Nation, recreational fishing and commercial fishing are different activities. Therefore, science-based conservation and management approaches should be adapted to the characteristics of each sector.

(b) Purposes

It is therefore declared to be the purposes of the Congress in this chapter--

(1) to take immediate action to conserve and manage the fishery resources found off the coasts of the United States, and the anadromous species and Continental Shelf fishery resources of the United States, by exercising (A) sovereign rights for the purposes of exploring, exploiting, conserving, and managing all fish, within the exclusive economic zone established by Presidential Proclamation 5030, dated March 10, 1983, and (B) exclusive fishery management authority beyond the exclusive economic zone over such anadromous species and Continental Shelf fishery resources;

(2) to support and encourage the implementation and enforcement of international fishery agreements for the conservation and management of highly migratory species, and to encourage the negotiation and implementation of additional such agreements as necessary;

5a

**(3)** to promote domestic commercial and recreational fishing under sound conservation and management principles, including the promotion of catch and release programs in recreational fishing;

**(4)** to provide for the preparation and implementation, in accordance with national standards, of fishery management plans which will achieve and maintain, on a continuing basis, the optimum yield from each fishery;

**(5)** to establish Regional Fishery Management Councils to exercise sound judgment in the stewardship of fishery resources through the preparation, monitoring, and revision of such plans under circumstances (A) which will enable the States, the fishing industry, consumer and environmental organizations, and other interested persons to participate in, and advise on, the establishment and administration of such plans, and (B) which take into account the social and economic needs of the States;

**(6)** to encourage the development by the United States fishing industry of fisheries which are currently underutilized or not utilized by United States fishermen, including bottom fish off Alaska, and to that end, to ensure that optimum yield determinations promote such development in a non-wasteful manner; and

**(7)** to promote the protection of essential fish habitat in the review of projects conducted under Federal permits, licenses, or other authorities that affect or have the potential to affect such habitat.

**(c)** Policy

It is further declared to be the policy of the Congress in this chapter--

**(1)** to maintain without change the existing territorial or other ocean jurisdiction of the United States for all purposes other than the conservation and management of fishery resources, as provided for in this chapter;

**(2)** to authorize no impediment to, or interference with, recognized legitimate uses of the high seas, except as necessary for the

conservation and management of fishery resources, as provided for in this chapter;

**(3)** to assure that the national fishery conservation and management program utilizes, and is based upon, the best scientific information available; involves, and is responsive to the needs of, interested and affected States and citizens; considers efficiency; draws upon Federal, State, and academic capabilities in carrying out research, administration, management, and enforcement; considers the effects of fishing on immature fish and encourages development of practical measures that minimize bycatch and avoid unnecessary waste of fish; and is workable and effective;

**(4)** to permit foreign fishing consistent with the provisions of this chapter;

**(5)** to support and encourage active United States efforts to obtain internationally acceptable agreements which provide for effective conservation and management of fishery resources, and to secure agreements to regulate fishing by vessels or persons beyond the exclusive economic zones of any nation;

**(6)** to foster and maintain the diversity of fisheries in the United States; and

**(7)** to ensure that the fishery resources adjacent to a Pacific Insular Area, including resident or migratory stocks within the exclusive economic zone adjacent to such areas, be explored, developed, conserved, and managed for the benefit of the people of such area and of the United States.

United States Code

Title 16. Conservation

Chapter 38. Fishery Conservation and Management

Subchapter IV. National Fishery Management Program

16 U.S.C. § 1851

### § 1851. National standards for fishery conservation and management

**(a)** In general

Any fishery management plan prepared, and any regulation promulgated to implement any such plan, pursuant to this subchapter shall be consistent with the following national standards for fishery conservation and management:

**(1)** Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

**(2)** Conservation and management measures shall be based upon the best scientific information available.

**(3)** To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination.

**(4)** Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

**(5)** Conservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources;

except that no such measure shall have economic allocation as its sole purpose.

**(6)** Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

**(7)** Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

**(8)** Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

**(9)** Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch.

**(10)** Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea.

**(b)** Guidelines

The Secretary shall establish advisory guidelines (which shall not have the force and effect of law), based on the national standards, to assist in the development of fishery management plans.

United States Code

Title 16. Conservation

Chapter 38. Fishery Conservation and Management

Subchapter IV. National Fishery Management Program

16 U.S.C. § 1852 (excerpts)

## § 1852. Regional Fishery Management Councils

### (a) Establishment

(1) There shall be established, within 120 days after April 13, 1976, eight Regional Fishery Management Councils, as follows:

### (A) New England Council

The New England Fishery Management Council shall consist of the States of Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut and shall have authority over the fisheries in the Atlantic Ocean seaward of such States (except as provided in paragraph (3)). The New England Council shall have 18 voting members, including 12 appointed by the Secretary in accordance with subsection (b)(2) (at least one of whom shall be appointed from each such State).

### (B) Mid-Atlantic Council

The Mid-Atlantic Fishery Management Council shall consist of the States of New York, New Jersey, Delaware, Pennsylvania, Maryland, Virginia, and North Carolina and shall have authority over the fisheries in the Atlantic Ocean seaward of such States (except North Carolina, and as provided in paragraph (3)). The Mid-Atlantic Council shall have 21 voting

members, including 13 appointed by the Secretary in accordance with subsection (b)(2) (at least one of whom shall be appointed from each such State).

### (C) South Atlantic Council

The South Atlantic Fishery Management Council shall consist of the States of North Carolina, South Carolina, Georgia, and Florida and shall have authority over the fisheries in the Atlantic Ocean seaward of such States (except as provided in paragraph (3)). The South Atlantic Council shall have 13 voting members, including 8 appointed by the Secretary in accordance with subsection (b)(2) (at least one of whom shall be appointed from each such State).

### (D) Caribbean Council

The Caribbean Fishery Management Council shall consist of the Virgin Islands and the Commonwealth of Puerto Rico and shall have authority over the fisheries in the Caribbean Sea and Atlantic Ocean seaward of such States and of commonwealths, territories, and possessions of the United States in the Caribbean Sea (except as provided in paragraph (3)). The Caribbean Council shall have 7 voting members, including 4 appointed by the Secretary in accordance with subsection (b)(2) (at least one of whom shall be appointed from each such State).

### (E) Gulf Council

The Gulf of Mexico Fishery Management Council shall consist of the States of Texas, Louisiana, Mississippi, Alabama, and Florida and shall have authority over the fisheries in the Gulf of Mexico seaward of such States (except as provided in paragraph (3)). The Gulf Council shall have 17 voting members, including 11 appointed by the Secretary in accordance with

subsection (b)(2) (at least one of whom shall be appointed from each such State).

### (F) Pacific Council

The Pacific Fishery Management Council shall consist of the States of California, Oregon, Washington, and Idaho and shall have authority over the fisheries in the Pacific Ocean seaward of such States. The Pacific Council shall have 14 voting members, including 8 appointed by the Secretary in accordance with subsection (b)(2) (at least one of whom shall be appointed from each such State), and including one appointed from an Indian tribe with Federally1 recognized fishing rights from California, Oregon, Washington, or Idaho in accordance with subsection (b)(5).

### (G) North Pacific Council

The North Pacific Fishery Management Council shall consist of the States of Alaska, Washington, and Oregon and shall have authority over the fisheries in the Arctic Ocean, Bering Sea, and Pacific Ocean seaward of Alaska. The North Pacific Council shall have 11 voting members, including 7 appointed by the Secretary in accordance with subsection (b)(2) (5 of whom shall be appointed from the State of Alaska and 2 of whom shall be appointed from the State of Washington).

### (H) Western Pacific Council

The Western Pacific Fishery Management Council shall consist of the States of Hawaii, American Samoa, Guam, and the Northern Mariana Islands and shall have authority over the fisheries in the Pacific Ocean seaward of such States and of the Commonwealths, territories, and possessions of the United States in the

Pacific Ocean area. The Western Pacific Council shall have 13 voting members, including 8 appointed by the Secretary in accordance with subsection (b)(2) (at least one of whom shall be appointed from each of the following States: Hawaii, American Samoa, Guam, and the Northern Mariana Islands).

(2) Each Council shall reflect the expertise and interest of the several constituent States in the ocean area over which such Council is granted authority.

(3) The Secretary shall have authority over any highly migratory species fishery that is within the geographical area of authority of more than one of the following Councils: New England Council, Mid-Atlantic Council, South Atlantic Council, Gulf Council, and Caribbean Council.

## (b) Voting members

(1) The voting members of each Council shall be:

(A) The principal State official with marine fishery management responsibility and expertise in each constituent State, who is designated as such by the Governor of the State, so long as the official continues to hold such position, or the designee of such official.

(B) The regional director of the National Marine Fisheries Service for the geographic area concerned, or his designee, except that if two such directors are within such geographical area, the Secretary shall designate which of such directors shall be the voting member.

(C) The members required to be appointed by the Secretary in accordance with paragraphs (2) and (5).

**(2)(A)** The members of each Council required to be appointed by the Secretary must be individuals who, by reason of their occupational or other experience, scientific expertise, or training, are knowledgeable regarding the conservation and management, or the commercial or recreational harvest, of the fishery resources of the geographical area concerned. Within nine months after November 28, 1990, the Secretary shall, by regulation, prescribe criteria for determining whether an individual satisfies the requirements of this subparagraph.

**(B)** The Secretary, in making appointments under this section, shall, to the extent practicable, ensure a fair and balanced apportionment, on a rotating or other basis, of the active participants (or their representatives) in the commercial and recreational fisheries under the jurisdiction of the Council. On January 31, 1991, and each year thereafter, the Secretary shall submit to the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Merchant Marine and Fisheries of the House of Representatives a report on the actions taken by the Secretary to ensure that such fair and balanced apportionment is achieved. The report shall--

**(i)** list the fisheries under the jurisdiction of each Council, outlining for each fishery the type and quantity of fish harvested, fishing and processing methods employed, the number of participants, the duration and range of the fishery, and other distinguishing characteristics;

**(ii)** assess the membership of each Council in terms of the apportionment of the active participants in each such fishery; and

**(iii)** state the Secretary's plans and schedule for actions to achieve a fair and balanced apportionment on the Council for the active participants in any such fishery.

**(C)** The Secretary shall appoint the members of each Council from a list of individuals submitted by the Governor of each applicable constituent State. A Governor may not submit the names of individuals to the Secretary for appointment unless the Governor has determined that each such individual is qualified under the requirements of subparagraph (A) and unless the Governor has, to the extent practicable, first consulted with representatives of the commercial and recreational fishing interests of the State regarding those individuals. Each such list shall include the names and pertinent biographical data of not less than three individuals for each applicable vacancy and shall be accompanied by a statement by the Governor explaining how each such individual meets the requirements of subparagraph (A). The Secretary shall review each list submitted by a Governor to ascertain if the individuals on the list are qualified for the vacancy on the basis of such requirements. If the Secretary determines that any individual is not qualified, the Secretary shall notify the appropriate Governor of that determination. The Governor shall then submit a revised list or resubmit the original list with an additional explanation of the qualifications of the individual in question. An individual is not eligible for appointment by the Secretary until that individual complies with the applicable financial disclosure requirements under subsection (k).

* * * * *

**(E)** Whenever the Secretary makes an appointment to a Council, the Secretary shall make a public

announcement of such appointment not less than 45 days before the first day on which the individual is to take office as a member of the Council.

(3) Each voting member appointed to a Council by the Secretary in accordance with paragraphs (2) and (5) shall serve for a term of 3 years; except that the Secretary may designate a shorter term if necessary to provide for balanced expiration to terms of office. No member appointed after January 1, 1986, may serve more than three consecutive terms. Any term in which an individual was appointed to replace a member who left office during the term shall not be counted in determining the number of consecutive terms served by that Council member.

(4) Successors to the voting members of any Council shall be appointed in the same manner as the original voting members. Any individual appointed to fill a vacancy occurring prior to the expiration of any term of office shall be appointed for the remainder of that term.

* * * * *

(6) The Secretary may remove for cause any member of a Council required to be appointed by the Secretary in accordance with paragraphs3 (2) or (5) if--

   (A) the Council concerned first recommends removal by not less than two-thirds of the members who are voting members and submits such removal recommendation to the Secretary in writing together with a statement of the basis for the recommendation; or

   (B) the member is found by the Secretary, after notice and an opportunity for a hearing in accordance with section 554 of Title 5, to have committed an act prohibited by section 1857(1)(O) of this title.

16a

## (c) Nonvoting members

(1) The nonvoting members of each Council shall be:

(A) The regional or area director of the United States Fish and Wildlife Service for the geographical area concerned, or his designee.

(B) The Commander of the Coast Guard district for the geographical area concerned, or his designee; except that, if two Coast Guard districts are within such geographical area, the commander designated for such purpose by the commandant of the Coast Guard.

(C) The executive director of the Marine Fisheries Commission for the geographical area concerned, if any, or his designee.

(D) One representative of the Department of State designated for such purpose by the Secretary of State, or his designee.

\* \* \* \* \*

## (d) Compensation and expenses

The voting members of each Council who are required to be appointed by the Secretary and who are not employed by the Federal Government or any State or local government, shall receive compensation at the daily rate for GS-15, step 7 of the General Schedule, when engaged in the actual performance of duties for such Council. The voting members of each Council, any nonvoting member described in subsection (c)(1)(C), and the nonvoting member appointed pursuant to subsection (c)(2) shall be reimbursed for actual expenses incurred in the performance of such duties, and other nonvoting members and Council staff members may be reimbursed for actual expenses.

**(e) Transaction of business**

(1) A majority of the voting members of any Council shall constitute a quorum, but one or more such members designated by the Council may hold hearings. All decisions of any Council shall be by majority vote of the voting members present and voting.

(2) The voting members of each Council shall select a Chairman for such Council from among the voting members.

(3) Each Council shall meet at appropriate times and places in any of the constituent States of the Council at the call of the Chairman or upon the request of a majority of its voting members.

(4) If any voting member of a Council disagrees with respect to any matter which is transmitted to the Secretary by such Council, such member may submit a statement to the Secretary setting forth the reasons for such disagreement. The regional director of the National Marine Fisheries Service serving on the Council, or the regional director's designee, shall submit such a statement, which shall be made available to the public upon request, if the regional director disagrees with any such matter.

(5) At the request of any voting member of a Council, the Council shall hold a roll call vote on any matter before the Council. The official minutes and other appropriate records of any Council meeting shall identify all roll call votes held, the name of each voting member present during each roll call vote, and how each member voted on each roll call vote.

**(f) Staff and administration**

(1) Each Council may appoint, and assign duties to, an executive director and such other full- and part-time administrative employees as the Secretary determines are necessary to the performance of its functions.

(2) Upon the request of any Council, and after consultation with the Secretary, the head of any Federal agency is authorized to detail to such Council, on a reimbursable basis, any of the personnel of such agency, to assist such Council in the performance of its functions under this chapter.

(3) The Secretary shall provide to each Council such administrative and technical support services as are necessary for the effective functioning of such Council.

(4) The Administrator of General Services shall furnish each Council with such offices, equipment, supplies, and services as he is authorized to furnish to any other agency or instrumentality of the United States.

(5) The Secretary and the Secretary of State shall furnish each Council with relevant information concerning foreign fishing and international fishery agreements.

(6) Each Council shall determine its organization, and prescribe its practices and procedures for carrying out its functions under this chapter, in accordance with such uniform standards as are prescribed by the Secretary. The procedures of a Council, and of its scientific and statistical committee and advisory panels established under subsection (g), must be consistent with the procedural guidelines set forth in subsection (i)(2). Each Council shall publish and make available to the public a statement of its organization, practices, and procedures.

(7) The Secretary shall pay--

**(A)** the compensation and expenses provided for in subsection (d);

**(B)** appropriate compensation to employees appointed under paragraph (1);

**(C)** the amounts required for reimbursement of other Federal agencies under paragraphs (2) and (4);

**(D)** the actual expenses of the members of the committees and panels established under subsection (g); and

**(E)** such other costs as the Secretary determines are necessary to the performance of the functions of the Councils.

## (g) Committees and advisory panels

* * * * *

**(4)** The Secretary shall establish advisory panels to assist in the collection and evaluation of information relevant to the development of any fishery management plan or plan amendment for a fishery to which subsection (a)(3) applies. Each advisory panel shall participate in all aspects of the development of the plan or amendment; be balanced in its representation of commercial, recreational, and other interests; and consist of not less than 7 individuals who are knowledgeable about the fishery for which the plan or amendment is developed, selected from among--

**(A)** members of advisory committees and species working groups appointed under Acts implementing relevant international fishery agreements pertaining to highly migratory species; and

**(B)** other interested persons.

\* \* \* \* \*

## (h) Functions

Each Council shall, in accordance with the provisions of this chapter--

(1) for each fishery under its authority that requires conservation and management, prepare and submit to the Secretary (A) a fishery management plan, and (B) amendments to each such plan that are necessary from time to time (and promptly whenever changes in conservation and management measures in another fishery substantially affect the fishery for which such plan was developed);

(2) prepare comments on any application for foreign fishing transmitted to it under section 1824(b)(4)(C) of this title or section 1824(d) of this title, and any fishery management plan or amendment transmitted to it under section 1854(c)(4) of this title;

(3) conduct public hearings, at appropriate times and in appropriate locations in the geographical area concerned, so as to allow all interested persons an opportunity to be heard in the development of fishery management plans and amendments to such plans, and with respect to the administration and implementation of the provisions of this chapter (and for purposes of this paragraph, the term "geographical area concerned" may include an area under the authority of another Council if the fish in the fishery concerned migrate into, or occur in, that area or if the matters being heard affect fishermen of that area; but not unless such other Council is first consulted regarding the conduct of such hearings within its area);

(4) submit to the Secretary such periodic reports as the Council deems appropriate, and any other relevant report which may be requested by the Secretary;

(5) review on a continuing basis, and revise as appropriate, the assessments and specifications made pursuant to section 1853(a)(3) and (4) of this title with respect to the optimum yield from, the capacity and extent to which United States fish processors will process United States harvested fish from, and the total allowable level of foreign fishing in, each fishery (except as provided in section4 subsection (a)(3)) within its geographical area of authority;

(6) develop annual catch limits for each of its managed fisheries that may not exceed the fishing level recommendations of its scientific and statistical committee or the peer review process established under subsection (g);

(7) develop, in conjunction with the scientific and statistical committee, multi-year research priorities for fisheries, fisheries interactions, habitats, and other areas of research that are necessary for management purposes, that shall--

(A) establish priorities for 5-year periods;

(B) be updated as necessary; and

(C) be submitted to the Secretary and the regional science centers of the National Marine Fisheries Service for their consideration in developing research priorities and budgets for the region of the Council;

(8) in addition to complying with the standards and requirements under paragraph (6), sections 1851(a), 1853(a)(15), and 1854(e) of this title, and other applicable provisions of this chapter, have the authority to use fishery management measures in a recreational fishery (or the recreational component of a mixed-use fishery) in developing a fishery management plan, plan amendment, or proposed regulations, such as extraction rates, fishing

mortality targets, harvest control rules, or traditional or cultural practices of native communities in such fishery or fishery component; and

**(9)** conduct any other activities which are required by, or provided for in, this chapter or which are necessary and appropriate to the foregoing functions.

## (i) Procedural matters

**(1)** Chapter 10 of Title 5 [Federal Advisory Committees] shall not apply to the Councils, the Council coordination committee established under subsection (l), or to the scientific and statistical committees or other committees or advisory panels established under subsection (g).

**(2)** The following guidelines apply with respect to the conduct of business at meetings of a Council, of the Council coordination committee established under subsection (l), and of the scientific and statistical committees or other committees or advisory panels established under subsection (g):

**(A)** Unless closed in accordance with paragraph (3), each regular meeting and each emergency meeting shall be open to the public.

**(B)** Emergency meetings shall be held at the call of the chairman or equivalent presiding officer.

**(C)** Timely public notice of each regular meeting and each emergency meeting, including the time, place, and agenda of the meeting, shall be provided by any means that will result in wide publicity in the major fishing ports of the region (and in other major fishing ports having a direct interest in the affected fishery), except that e-mail notification and website postings alone are not sufficient. Timely notice of each regular meeting shall also be published in the Federal Register. The

published agenda of the meeting may not be modified to include additional matters for Council action without public notice or within 14 days prior to the meeting date, unless such modification is to address an emergency action under section 1855(c) of this title, in which case public notice shall be given immediately.

**(D)** Interested persons shall be permitted to present oral or written statements regarding the matters on the agenda at meetings. All written information submitted to a Council by an interested person shall include a statement of the source and date of such information. Any oral or written statement shall include a brief description of the background and interests of the person in the subject of the oral or written statement.

**(E)** Detailed minutes of each meeting of the Council, except for any closed session, shall be kept and shall contain a record of the persons present, a complete and accurate description of matters discussed and conclusions reached, and copies of all statements filed. The Chairman shall certify the accuracy of the minutes of each such meeting and submit a copy thereof to the Secretary. The minutes shall be made available to any court of competent jurisdiction.

**(F)** Subject to the procedures established under paragraph (4), and the guidelines prescribed by the Secretary under section 1881a(b) of this title, relating to confidentiality, the administrative record, including minutes required under subparagraph (E), of each meeting, and records or other documents which were made available to or prepared for or by the Council, committee, or panel incident to the meeting, shall be available for public inspection and copying at a single location in the offices of the Council or the Secretary, as appropriate.

\* \* \* \* \*

**(j) Disclosure of financial interest and recusal**

    **(1)** For the purposes of this subsection--

        **(A)** the term "affected individual" means an individual who--

            **(i)** is nominated by the Governor of a State for appointment as a voting member of a Council in accordance with subsection (b)(2); or

            **(ii)** is a voting member of a Council appointed--

                **(I)** under subsection (b)(2); or

                **(II)** under subsection (b)(5) who is not subject to disclosure and recusal requirements under the laws of an Indian tribal government; and

        **(B)** the term "designated official" means a person with expertise in Federal conflict-of-interest requirements who is designated by the Secretary, in consultation with the Council, to attend Council meetings and make determinations under paragraph (7)(B).

    **(2)** Each affected individual must disclose any financial interest held by--

        **(A)** that individual;

        **(B)** the spouse, minor child, or partner of that individual; and

        **(C)** any organization (other than the Council) in which that individual is serving as an officer, director, trustee, partner, or employee;

in any harvesting, processing, lobbying, advocacy, or marketing activity that is being, or will be, undertaken within any fishery over which the Council concerned has jurisdiction, or with respect to an individual or organization with a financial interest in such activity.

(3) The disclosure required under paragraph (2) shall be made--

  (A) in the case of an affected individual referred to in paragraph (1)(A)(i), before appointment by the Secretary; and

  (B) in the case of an affected individual referred to in paragraph (1)(A)(ii), within 45 days of taking office.

(4) An affected individual referred to in paragraph (1)(A)(ii) must update his or her disclosure form at any time any such financial interest is acquired, or substantially changed, by any person referred to in paragraph (2)(A), (B), or (C).

(5) The financial interest disclosures required by this subsection shall--

  (A) be made on such forms, in accordance with such procedures, and at such times, as the Secretary shall by regulation prescribe;

  (B) be kept on file by the Council and made available on the Internet and for public inspection at the Council offices during reasonable hours; and

  (C) be kept on file by the Secretary for use in reviewing determinations under paragraph (7)(B) and made available for public inspection at reasonable hours.

**(6)** The participation by an affected individual referred to in paragraph (1)(A)(ii) in an action by a Council during any time in which that individual is not in compliance with the regulations prescribed under paragraph (5) may not be treated as cause for the invalidation of that action.

**(7)(A)** After the effective date of regulations promulgated under subparagraph (F) of this paragraph, an affected individual required to disclose a financial interest under paragraph (2) shall not vote on a Council decision which would have a significant and predictable effect on such financial interest. A Council decision shall be considered to have a significant and predictable effect on a financial interest if there is a close causal link between the Council decision and an expected and substantially disproportionate benefit to the financial interest of the affected individual relative to the financial interests of other participants in the same gear type or sector of the fishery. An affected individual who may not vote may participate in Council deliberations relating to the decision after notifying the Council of the voting recusal and identifying the financial interest that would be affected.

**(B)** At the request of an affected individual, or upon the initiative of the appropriate designated official, the designated official shall make a determination for the record whether a Council decision would have a significant and predictable effect on a financial interest.

**(C)** Any Council member may submit a written request to the Secretary to review any determination by the designated official under subparagraph (B) within 10 days of such determination. Such review shall be completed within 30 days of receipt of the request.

**(D)** Any affected individual who does not vote in a Council decision in accordance with this subsection may state for the record how he or she would have voted on such decision if he or she had voted.

**(E)** If the Council makes a decision before the Secretary has reviewed a determination under subparagraph (C), the eventual ruling may not be treated as cause for the invalidation or reconsideration by the Secretary of such decision.

**(F)** The Secretary, in consultation with the Councils and by not later than one year from October 11, 1996, shall promulgate regulations which prohibit an affected individual from voting in accordance with subparagraph (A), and which allow for the making of determinations under subparagraphs (B) and (C).

**(8)** Section 208 of Title 18 does not apply to an affected individual referred to in paragraph (1)(A)(ii) during any time in which that individual is in compliance with the regulations prescribed under paragraph (5).

**(9)** On January 1, 2008, and annually thereafter, the Secretary shall submit a report to the Senate Committee on Commerce, Science, and Transportation and the House of Representatives Committee on Resources on action taken by the Secretary and the Councils to implement the disclosure of financial interest and recusal requirements of this subsection, including identification of any conflict of interest problems with respect to the Councils and scientific and statistical committees and recommendations for addressing any such problems.

* * * * *

United States Code

Title 16. Conservation

Chapter 38. Fishery Conservation and Management

Subchapter IV. National Fishery Management Program

16 U.S.C. § 1853

§ 1853. Contents of fishery management plans

(a) Required provisions

Any fishery management plan which is prepared by any Council, or by the Secretary, with respect to any fishery, shall--

(1) contain the conservation and management measures, applicable to foreign fishing and fishing by vessels of the United States, which are--

(A) necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery;

(B) described in this subsection or subsection (b), or both; and

(C) consistent with the national standards, the other provisions of this chapter, regulations implementing recommendations by international organizations in which the United States participates (including but not limited to closed areas, quotas, and size limits), and any other applicable law;

(2) contain a description of the fishery, including, but not limited to, the number of vessels involved, the type and quantity of fishing gear used, the species of fish involved and their location, the cost likely to be incurred in management, actual and potential revenues from the fishery, any recreational interests in the fishery, and the nature and extent of foreign fishing and Indian treaty fishing rights, if any;

(3) assess and specify the present and probable future condition of, and the maximum sustainable yield and optimum yield from, the fishery, and include a summary of the information utilized in making such specification;

(4) assess and specify--

    (A) the capacity and the extent to which fishing vessels of the United States, on an annual basis, will harvest the optimum yield specified under paragraph (3),

    (B) the portion of such optimum yield which, on an annual basis, will not be harvested by fishing vessels of the United States and can be made available for foreign fishing, and

    (C) the capacity and extent to which United States fish processors, on an annual basis, will process that portion of such optimum yield that will be harvested by fishing vessels of the United States;

(5) specify the pertinent data which shall be submitted to the Secretary with respect to commercial, recreational,1 charter fishing, and fish processing in the fishery, including, but not limited to, information regarding the type and quantity of fishing gear used, catch by species in numbers of fish or weight thereof, areas in which fishing was engaged in, time of fishing, number of hauls, economic information necessary to meet the requirements of this chapter, and the estimated processing capacity of,

and the actual processing capacity utilized by, United States fish processors;

(6) consider and provide for temporary adjustments, after consultation with the Coast Guard and persons utilizing the fishery, regarding access to the fishery for vessels otherwise prevented from harvesting because of weather or other ocean conditions affecting the safe conduct of the fishery; except that the adjustment shall not adversely affect conservation efforts in other fisheries or discriminate among participants in the affected fishery;

(7) describe and identify essential fish habitat for the fishery based on the guidelines established by the Secretary under section 1855(b)(1)(A) of this title, minimize to the extent practicable adverse effects on such habitat caused by fishing, and identify other actions to encourage the conservation and enhancement of such habitat;

(8) in the case of a fishery management plan that, after January 1, 1991, is submitted to the Secretary for review under section 1854(a) of this title (including any plan for which an amendment is submitted to the Secretary for such review) or is prepared by the Secretary, assess and specify the nature and extent of scientific data which is needed for effective implementation of the plan;

(9) include a fishery impact statement for the plan or amendment (in the case of a plan or amendment thereto submitted to or prepared by the Secretary after October 1, 1990) which shall assess, specify, and analyze the likely effects, if any, including the cumulative conservation, economic, and social impacts, of the conservation and management measures on, and possible mitigation measures for--

  (A) participants in the fisheries and fishing communities affected by the plan or amendment;

(B) participants in the fisheries conducted in adjacent areas under the authority of another Council, after consultation with such Council and representatives of those participants; and

(C) the safety of human life at sea, including whether and to what extent such measures may affect the safety of participants in the fishery;

(10) specify objective and measurable criteria for identifying when the fishery to which the plan applies is overfished (with an analysis of how the criteria were determined and the relationship of the criteria to the reproductive potential of stocks of fish in that fishery) and, in the case of a fishery which the Council or the Secretary has determined is approaching an overfished condition or is overfished, contain conservation and management measures to prevent overfishing or end overfishing and rebuild the fishery;

(11) establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery, and include conservation and management measures that, to the extent practicable and in the following priority--

(A) minimize bycatch; and

(B) minimize the mortality of bycatch which cannot be avoided;

(12) assess the type and amount of fish caught and released alive during recreational fishing under catch and release fishery management programs and the mortality of such fish, and include conservation and management measures that, to the extent practicable, minimize mortality and ensure the extended survival of such fish;

**(13)** include a description of the commercial, recreational, and charter fishing sectors which participate in the fishery, including its economic impact, and, to the extent practicable, quantify trends in landings of the managed fishery resource by the commercial, recreational, and charter fishing sectors;

**(14)** to the extent that rebuilding plans or other conservation and management measures which reduce the overall harvest in a fishery are necessary, allocate, taking into consideration the economic impact of the harvest restrictions or recovery benefits on the fishery participants in each sector, any harvest restrictions or recovery benefits fairly and equitably among the commercial, recreational, and charter fishing sectors in the fishery and;3

**(15)** establish a mechanism for specifying annual catch limits in the plan (including a multiyear plan), implementing regulations, or annual specifications, at a level such that overfishing does not occur in the fishery, including measures to ensure accountability.

## (b) Discretionary provisions

Any fishery management plan which is prepared by any Council, or by the Secretary, with respect to any fishery, may--

**(1)** require a permit to be obtained from, and fees to be paid to, the Secretary, with respect to--

**(A)** any fishing vessel of the United States fishing, or wishing to fish, in the exclusive economic zone or for anadromous species or Continental Shelf fishery resources beyond such zone;

**(B)** the operator of any such vessel; or

(C) any United States fish processor who first receives fish that are subject to the plan;

(2)(A) designate zones where, and periods when, fishing shall be limited, or shall not be permitted, or shall be permitted only by specified types of fishing vessels or with specified types and quantities of fishing gear;

(B) designate such zones in areas where deep sea corals are identified under section 1884 of this title, to protect deep sea corals from physical damage from fishing gear or to prevent loss or damage to such fishing gear from interactions with deep sea corals, after considering long-term sustainable uses of fishery resources in such areas; and

(C) with respect to any closure of an area under this chapter that prohibits all fishing, ensure that such closure--

(i) is based on the best scientific information available;

(ii) includes criteria to assess the conservation benefit of the closed area;

(iii) establishes a timetable for review of the closed area's performance that is consistent with the purposes of the closed area; and

(iv) is based on an assessment of the benefits and impacts of the closure, including its size, in relation to other management measures (either alone or in combination with such measures), including the benefits and impacts of limiting access to: users of the area, overall fishing activity, fishery science, and fishery and marine conservation;

(3) establish specified limitations which are necessary and appropriate for the conservation and management of the fishery on the--

>   (A) catch of fish (based on area, species, size, number, weight, sex, bycatch, total biomass, or other factors);
>
>   (B) sale of fish caught during commercial, recreational, or charter fishing, consistent with any applicable Federal and State safety and quality requirements; and
>
>   (C) transshipment or transportation of fish or fish products under permits issued pursuant to section 1824 of this title;

(4) prohibit, limit, condition, or require the use of specified types and quantities of fishing gear, fishing vessels, or equipment for such vessels, including devices which may be required to facilitate enforcement of the provisions of this chapter;

(5) incorporate (consistent with the national standards, the other provisions of this chapter, and any other applicable law) the relevant fishery conservation and management measures of the coastal States nearest to the fishery and take into account the different circumstances affecting fisheries from different States and ports, including distances to fishing grounds and proximity to time and area closures;

(6) establish a limited access system for the fishery in order to achieve optimum yield if, in developing such system, the Council and the Secretary take into account--

>   (A) present participation in the fishery;
>
>   (B) historical fishing practices in, and dependence on, the fishery;

(C) the economics of the fishery;

(D) the capability of fishing vessels used in the fishery to engage in other fisheries;

(E) the cultural and social framework relevant to the fishery and any affected fishing communities;

(F) the fair and equitable distribution of access privileges in the fishery; and

(G) any other relevant considerations;

(7) require fish processors who first receive fish that are subject to the plan to submit data which are necessary for the conservation and management of the fishery;

(8) require that one or more observers be carried on board a vessel of the United States engaged in fishing for species that are subject to the plan, for the purpose of collecting data necessary for the conservation and management of the fishery; except that such a vessel shall not be required to carry an observer on board if the facilities of the vessel for the quartering of an observer, or for carrying out observer functions, are so inadequate or unsafe that the health or safety of the observer or the safe operation of the vessel would be jeopardized;

(9) assess and specify the effect which the conservation and management measures of the plan will have on the stocks of naturally spawning anadromous fish in the region;

(10) include, consistent with the other provisions of this chapter, conservation and management measures that provide harvest incentives for participants within each gear group to employ fishing practices that result in lower levels of bycatch or in lower levels of the mortality of bycatch;

(11) reserve a portion of the allowable biological catch of the fishery for use in scientific research;

(12) include management measures in the plan to conserve target and non-target species and habitats, considering the variety of ecological factors affecting fishery populations; and

(14) prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery.

## (c) Proposed regulations

Proposed regulations which the Council deems necessary or appropriate for the purposes of--

(1) implementing a fishery management plan or plan amendment shall be submitted to the Secretary simultaneously with the plan or amendment under section 1854 of this title; and

(2) making modifications to regulations implementing a fishery management plan or plan amendment may be submitted to the Secretary at any time after the plan or amendment is approved under section 1854 of this title.

United States Code

Title 16. Conservation

Chapter 38. Fishery Conservation and Management

Subchapter IV. National Fishery Management Program

16 U.S.C. § 1854

§ 1854. Action by Secretary

(a) Review of plans

(1) Upon transmittal by the Council to the Secretary of a fishery management plan or plan amendment, the Secretary shall--

(A) immediately commence a review of the plan or amendment to determine whether it is consistent with the national standards, the other provisions of this chapter, and any other applicable law; and

(B) immediately publish in the Federal Register a notice stating that the plan or amendment is available and that written information, views, or comments of interested persons on the plan or amendment may be submitted to the Secretary during the 60-day period beginning on the date the notice is published.

(2) In undertaking the review required under paragraph (1), the Secretary shall--

(A) take into account the information, views, and comments received from interested persons;

(B) consult with the Secretary of State with respect to foreign fishing; and

(C) consult with the Secretary of the department in which the Coast Guard is operating with respect to enforcement at sea and to fishery access adjustments referred to in section 1853(a)(6) of this title.

(3) The Secretary shall approve, disapprove, or partially approve a plan or amendment within 30 days of the end of the comment period under paragraph (1) by written notice to the Council. A notice of disapproval or partial approval shall specify--

   (A) the applicable law with which the plan or amendment is inconsistent;

   (B) the nature of such inconsistencies; and

   (C) recommendations concerning the actions that could be taken by the Council to conform such plan or amendment to the requirements of applicable law.

If the Secretary does not notify a Council within 30 days of the end of the comment period of the approval, disapproval, or partial approval of a plan or amendment, then such plan or amendment shall take effect as if approved.

(4) If the Secretary disapproves or partially approves a plan or amendment, the Council may submit a revised plan or amendment to the Secretary for review under this subsection.

(5) For purposes of this subsection and subsection (b), the term "immediately" means on or before the 5th day after the day on which a Council transmits to the Secretary a fishery management plan, plan amendment, or proposed regulation that the Council characterizes as final.

**(b) Review of regulations**

(1) Upon transmittal by the Council to the Secretary of proposed regulations prepared under section 1853(c) of this title, the Secretary shall immediately initiate an evaluation of the proposed regulations to determine whether they are consistent with the fishery management plan, plan amendment, this chapter and other applicable law. Within 15 days of initiating such evaluation the Secretary shall make a determination and--

(A) if that determination is affirmative, the Secretary shall publish such regulations in the Federal Register, with such technical changes as may be necessary for clarity and an explanation of those changes, for a public comment period of 15 to 60 days; or

(B) if that determination is negative, the Secretary shall notify the Council in writing of the inconsistencies and provide recommendations on revisions that would make the proposed regulations consistent with the fishery management plan, plan amendment, this chapter, and other applicable law.

(2) Upon receiving a notification under paragraph (1)(B), the Council may revise the proposed regulations and submit them to the Secretary for reevaluation under paragraph (1).

(3) The Secretary shall promulgate final regulations within 30 days after the end of the comment period under paragraph (1)(A). The Secretary shall consult with the Council before making any revisions to the proposed regulations, and must publish in the Federal Register an explanation of any differences between the proposed and final regulations.

**(c) Preparation and review of Secretarial plans**

(1) The Secretary may prepare a fishery management plan, with respect to any fishery, or any amendment to any such plan, in accordance with the national standards, the other provisions of this chapter, and any other applicable law, if--

(A) the appropriate Council fails to develop and submit to the Secretary, after a reasonable period of time, a fishery management plan for such fishery, or any necessary amendment to such a plan, if such fishery requires conservation and management;

(B) the Secretary disapproves or partially disapproves any such plan or amendment, or disapproves a revised plan or amendment, and the Council involved fails to submit a revised or further revised plan or amendment; or

(C) the Secretary is given authority to prepare such plan or amendment under this section.

(2) In preparing any plan or amendment under this subsection, the Secretary shall--

(A) conduct public hearings, at appropriate times and locations in the geographical areas concerned, so as to allow interested persons an opportunity to be heard in the preparation and amendment of the plan and any regulations implementing the plan; and

(B) consult with the Secretary of State with respect to foreign fishing and with the Secretary of the department in which the Coast Guard is operating with respect to enforcement at sea.

(3) Notwithstanding paragraph (1) for a fishery under the authority of a Council, the Secretary may not include in any fishery management plan, or any amendment to any such plan, prepared by him, a provision establishing a limited access system, including any limited access privilege program, unless such system is first approved by a majority of the voting members, present and voting, of each appropriate Council.

(4) Whenever the Secretary prepares a fishery management plan or plan amendment under this section, the Secretary shall immediately--

    (A) for a plan or amendment for a fishery under the authority of a Council, submit such plan or amendment to the appropriate Council for consideration and comment; and

    (B) publish in the Federal Register a notice stating that the plan or amendment is available and that written information, views, or comments of interested persons on the plan or amendment may be submitted to the Secretary during the 60-day period beginning on the date the notice is published.

(5) Whenever a plan or amendment is submitted under paragraph (4)(A), the appropriate Council must submit its comments and recommendations, if any, regarding the plan or amendment to the Secretary before the close of the 60-day period referred to in paragraph (4)(B). After the close of such 60-day period, the Secretary, after taking into account any such comments and recommendations, as well as any views, information, or comments submitted under paragraph (4)(B), may adopt such plan or amendment.

**(6)** The Secretary may propose regulations in the Federal Register to implement any plan or amendment prepared by the Secretary. In the case of a plan or amendment to which paragraph (4)(A) applies, such regulations shall be submitted to the Council with such plan or amendment. The comment period on proposed regulations shall be 60 days, except that the Secretary may shorten the comment period on minor revisions to existing regulations.

**(7)** The Secretary shall promulgate final regulations within 30 days after the end of the comment period under paragraph (6). The Secretary must publish in the Federal Register an explanation of any substantive differences between the proposed and final rules. All final regulations must be consistent with the fishery management plan, with the national standards and other provisions of this chapter, and with any other applicable law.

\* \* \* \* \*

### (e) Rebuilding overfished fisheries

**(1)** The Secretary shall report annually to the Congress and the Councils on the status of fisheries within each Council's geographical area of authority and identify those fisheries that are overfished or are approaching a condition of being overfished. For those fisheries managed under a fishery management plan or international agreement, the status shall be determined using the criteria for overfishing specified in such plan or agreement. A fishery shall be classified as approaching a condition of being overfished if, based on trends in fishing effort, fishery resource size, and other appropriate factors, the Secretary estimates that the fishery will become overfished within two years.

(2) If the Secretary determines at any time that a fishery is overfished, the Secretary shall immediately notify the appropriate Council and request that action be taken to end overfishing in the fishery and to implement conservation and management measures to rebuild affected stocks of fish. The Secretary shall publish each notice under this paragraph in the Federal Register.

(3) Within 2 years after an identification under paragraph (1) or notification under paragraphs (2) or (7), the appropriate Council (or the Secretary, for fisheries under section 1852(a)(3) of this title) shall prepare and implement a fishery management plan, plan amendment, or proposed regulations for the fishery to which the identification or notice applies--

(A) to end overfishing immediately in the fishery and to rebuild affected stocks of fish; or

(B) to prevent overfishing from occurring in the fishery whenever such fishery is identified as approaching an overfished condition.

(4) For a fishery that is overfished, any fishery management plan, amendment, or proposed regulations prepared pursuant to paragraph (3) or paragraph (5) for such fishery shall--

(A) specify a time period for rebuilding the fishery that shall--

(i) be as short as possible, taking into account the status and biology of any overfished stocks of fish, the needs of fishing communities, recommendations by international organizations in which the United States participates, and the interaction of the overfished stock of fish within the marine ecosystem; and

(ii) not exceed 10 years, except in cases where the biology of the stock of fish, other environmental conditions, or management measures under an international agreement in which the United States participates dictate otherwise;

(B) allocate both overfishing restrictions and recovery benefits fairly and equitably among sectors of the fishery; and

(C) for fisheries managed under an international agreement, reflect traditional participation in the fishery, relative to other nations, by fishermen of the United States.

(5) If, within the 2-year period beginning on the date of identification or notification that a fishery is overfished, the Council does not submit to the Secretary a fishery management plan, plan amendment, or proposed regulations required by paragraph (3)(A), the Secretary shall prepare a fishery management plan or plan amendment and any accompanying regulations to stop overfishing and rebuild affected stocks of fish within 9 months under subsection (c).

(6) During the development of a fishery management plan, a plan amendment, or proposed regulations required by this subsection, the Council may request the Secretary to implement interim measures to reduce overfishing under section 1855(c) of this title until such measures can be replaced by such plan, amendment, or regulations. Such measures, if otherwise in compliance with the provisions of this chapter, may be implemented even though they are not sufficient by themselves to stop overfishing of a fishery.

**(7)** The Secretary shall review any fishery management plan, plan amendment, or regulations required by this subsection at routine intervals that may not exceed two years. If the Secretary finds as a result of the review that such plan, amendment, or regulations have not resulted in adequate progress toward ending overfishing and rebuilding affected fish stocks, the Secretary shall--

> **(A)** in the case of a fishery to which section 1852(a)(3) of this title applies, immediately make revisions necessary to achieve adequate progress; or

> **(B)** for all other fisheries, immediately notify the appropriate Council. Such notification shall recommend further conservation and management measures which the Council should consider under paragraph (3) to achieve adequate progress.

\* \* \* \* \*

### (h) Repeal or revocation of a fishery management plan

The Secretary may repeal or revoke a fishery management plan for a fishery under the authority of a Council only if the Council approves the repeal or revocation by a three-quarters majority of the voting members of the Council.

\* \* \* \* \*

United States Code

Title 16. Conservation

Chapter 38. Fishery Conservation and Management

Subchapter IV. National Fishery Management Program

16 U.S.C. § 1855

§ 1855. Other requirements and authority

* * * * *

(c) Emergency actions and interim measures

(1) If the Secretary finds that an emergency exists or that interim measures are needed to reduce overfishing for any fishery, he may promulgate emergency regulations or interim measures necessary to address the emergency or overfishing, without regard to whether a fishery management plan exists for such fishery.

(2) If a Council finds that an emergency exists or that interim measures are needed to reduce overfishing for any fishery within its jurisdiction, whether or not a fishery management plan exists for such fishery--

(A) the Secretary shall promulgate emergency regulations or interim measures under paragraph (1) to address the emergency or overfishing if the Council, by unanimous vote of the members who are voting members, requests the taking of such action; and

(B) the Secretary may promulgate emergency regulations or interim measures under paragraph (1) to address the emergency or overfishing if the Council, by less than a unanimous vote, requests the taking of such action.

(3) Any emergency regulation or interim measure which changes any existing fishery management plan or amendment shall be treated as an amendment to such plan for the period in which such regulation is in effect. Any emergency regulation or interim measure promulgated under this subsection--

(A) shall be published in the Federal Register together with the reasons therefor;

(B) shall, except as provided in subparagraph (C), remain in effect for not more than 180 days after the date of publication, and may be extended by publication in the Federal Register for one additional period of not more than 186 days, provided the public has had an opportunity to comment on the emergency regulation or interim measure, and, in the case of a Council recommendation for emergency regulations or interim measures, the Council is actively preparing a fishery management plan, plan amendment, or proposed regulations to address the emergency or overfishing on a permanent basis;

(C) that responds to a public health emergency or an oil spill may remain in effect until the circumstances that created the emergency no longer exist, Provided, That the public has an opportunity to comment after the regulation is published, and, in the case of a public health emergency, the Secretary of Health and Human Services concurs with the Secretary's action; and

(D) may be terminated by the Secretary at an earlier date by publication in the Federal Register of a notice of termination, except for emergency regulations or interim measures promulgated under paragraph (2) in which case such early termination may be made only upon the agreement of the Secretary and the Council concerned.

## (d) Responsibility of Secretary

The Secretary shall have general responsibility to carry out any fishery management plan or amendment approved or prepared by him, in accordance with the provisions of this chapter. The Secretary may promulgate such regulations, in accordance with section 553 of Title 5, as may be necessary to discharge such responsibility or to carry out any other provision of this chapter.

\* \* \* \* \*

## (f) Judicial review

(1) Regulations promulgated by the Secretary under this chapter and actions described in paragraph (2) shall be subject to judicial review to the extent authorized by, and in accordance with, chapter 7 of Title 5, if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable; except that--

(A) section 705 of such title is not applicable, and

(B) the appropriate court shall only set aside any such regulation or action on a ground specified in section 706(2)(A), (B), (C), or (D) of such title.

(2) The actions referred to in paragraph (1) are actions that are taken by the Secretary under regulations which implement a fishery management plan, including but not limited to actions that establish the date of closure of a fishery to commercial or recreational fishing.

**(3)(A)** Notwithstanding any other provision of law, the Secretary shall file a response to any petition filed in accordance with paragraph (1), not later than 45 days after the date the Secretary is served with that petition, except that the appropriate court may extend the period for filing such a response upon a showing by the Secretary of good cause for that extension.

**(B)** A response of the Secretary under this paragraph shall include a copy of the administrative record for the regulations that are the subject of the petition.

**(4)** Upon a motion by the person who files a petition under this subsection, the appropriate court shall assign the matter for hearing at the earliest possible date and shall expedite the matter in every possible way.

* * * * *